**UNITED STATES of America,**
**Appellee,**

v.

**Donald Joseph Alan FITZPATRICK,**
**Appellant.**

**No. 339, Docket 34792.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 11, 1970.

Decided Dec. 24, 1970.

---

Desmond J. O'Sullivan, Asst. U. S. Atty. (Edward R. Neaher, U. S. Atty., E. D. N. Y., on the brief), for appellee.

Haliburton Fales, 2d, New York City, for appellant.

Before LUMBARD, Chief Judge, and WATERMAN and ANDERSON, Circuit Judges.

LUMBARD, Chief Judge:

This is an appeal from a judgment of the Eastern District of New York, rendered April 10, 1970, wherein appellant Fitzpatrick was convicted, after trial without a jury, of violating 18 U.S.C. § 2314 by causing falsely made and forged securities to be transported in interstate commerce. He was sentenced pursuant to 18 U.S.C. § 5010(b) for treatment, supervision, training and observation. On this appeal Fitzpatrick challenges his conviction on several grounds. We reverse the conviction for the reason that defense counsel's cross-examination of two of the government's witnesses was unreasonably curtailed and we remand for a new trial.

Fitzpatrick was employed by Travelers Express Company from March 6 to 17, 1967. During this period he was introduced to Irving Weissman, the proprietor of a store doing business with Travelers, as a representative of that company. On May 21, 1967, after he had left Travelers, he returned to Weissman's store under the pretext of still being a representative of Travelers and obtained from Weissman a full money order book containing two hundred orders.

Between May 22 and June 20, 1967, several of the money orders which Weissman had handed over to Fitzpatrick were deposited in the Flatbush Saving Bank in Brooklyn by a "John Harrison." When five of the money orders were returned unpaid, the bank notified the FBI. During the course of the investigation, FBI agents obtained a picture of Fitzpatrick from Travelers and arrested him on July 9, 1967. After the arrest, the agents mixed Fitzpatrick's picture with seventeen other photographs and showed them to several bank employees who picked out Fitzpatrick as the "John Harrison" who had cashed the money orders. On July 24, 1967, Fitzpatrick was released on his own recognizance until trial, about two and one-half years later. He was indicted on May 28, 1968. Several weeks prior to trial, which commenced on January 27, 1970, the witnesses again made a photographic identification of Fitzpatrick.

At the commencement of trial, counsel for Fitzpatrick moved pursuant to Rule 43, F.R.Crim.P., to waive Fitzpatrick's right to be present in the courtroom, but his motion was denied. The main issue at trial was the identification of the defendant; and to prove its case on this issue, the government offered the testimony of four witnesses—Weissman and the three bank employees, Mildred Toma, Henrietta Campbell, and Edward Hoffman. All four also made in-court identification of Fitzpatrick. At the end of the government's case, Fitzpatrick's counsel moved for acquittal on the grounds that the photographs shown to the witnesses were impermissibly suggestive and that Fitzpatrick's right to a speedy trial had been violated. The motion was denied. Finally, Fitzpatrick testified in his own behalf and denied that he had cashed the money orders in question. Fitzpatrick was convicted by Judge Rayfiel, having waived trial by jury.

Fitzpatrick alleges five reasons why his conviction should be reversed. The

first four have no merit and will be discussed later.

■ Fitzpatrick's fifth contention is that the trial court unreasonably curtailed defense counsel's attempt on cross-examination of two of the three bank employees who identified the defendant, to determine whether those witnesses remembered particular physical characteristics of the defendant. On this issue we agree with Fitzpatrick, and we reverse his conviction and remand for a new trial.

Bank Teller Mildred Toma testified that she had seen John Harrison come into the bank to cash the money orders on three or four occasions and that she had seen him for five or ten minutes each time. She thought Harrison was about twenty-five years old and approximately six-feet tall, and she positively identified Fitzpatrick as Harrison. During cross-examination the following exchange took place:

> The Court: Are you sure that is the gentleman?
>
> The Witness: I am sure.

Q. Were there any physical characteristics of Mr. Harrison that you remember?

> Mr. O'Sullivan: Objection, your Honor.
>
> The Court: Sustained.
>
> The Witness: I'm sorry?
>
> The Court: Don't answer, please. I sustained the objection to the question.

Q. How did Mr. Harrison comb his hair?

> Mr. O'Sullivan: Objection.
>
> The Court: Sustained.
>
> She said she is positive that is the man that she understood to be Mr. Harrison. She is positive about it.

Q. Were there any—was he wearing glasses at the time you saw him in the bank?

> Mr. O'Sullivan: Objection.
>
> The Court: Sustained.
>
> Mr. Burns: Exception.

Q. Did you ever have any conversation with this John Harrison in the bank? A. No, not that I remember.

Q. Did he ever say anything to you?

> Mr. O'Sullivan: Your Honor—
>
> The Court: Did he ever what?

Q. Say anything to you?

> Mr. O'Sullivan: I'm going to object to that. Just answer—
>
> The Court: Sustained.

Q. Did you ever say anything to John Harrison?

> Mr. O'Sullivan: Objection, your Honor.
>
> The Court: Sustained.
>
> She stated she had no conversation. She can't remember any conversation.

Subsequently Bank Officer Edward Hoffman testified that that he saw John Harrison in the bank on two occasions, once for five minutes from twelve to fifteen feet, and once for two minutes from about twenty feet. He testified that Harrison had not worn glasses, and he positively identified the defendant as Harrison. The record shows the following during the cross-examination of Hoffman:

Q. For how long a period of time, if you added it together, would you say that you observed this gentleman, Harrison, in 1967?

> Mr. O'Sullivan: Now, your Honor—
>
> A. 7 minutes, maybe, all together.
>
> The Court: All right.

Q. Did that 7 minutes give you any particular impression of Mr. Harrison? A. Well, I wanted to—

Q. No. Did it give you any particular impression—

> Mr. O'Sullivan: Your Honor, I object.
>
> The Court: Sustained.

A. I wanted to see—

> The Court: No. Don't answer, please.
>
> The Witness: I'm sorry.

The Court: I have sustained the objection.

We have had Mr. Hoffman's testimony respecting the two occasions that we [sic] saw him, one, when he was about 20 feet away, and one when he was about 12 or 15 feet away, when he was at the window. He observed him on one other occasion for about five minutes.

Full and fair cross-examination is the cornerstone of the adversary system. As Dean Wigmore has stated, cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth." [1] The New York Court of Appeals stated in the famous case of People v. Becker, 210 N.Y. 274, 305, 104 N.E. 396, 407 (1914), quoting from Wigmore:

"For two centuries past, the policy of the Anglo-American system of evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience." [2]

We have recently reemphasized that wide latitude should be allowed in defense cross-examination regarding the credibility of government witnesses. United States v. Wolfson, 437 F.2d 862 (2d Cir. 1970); United States v. Padgent, 432 F.2d 701 (2d Cir. 1970). See also United States v. Masino, 275 F.2d 129, 132–133 (2d Cir. 1960). In Gordon v. United States, 344 U.S. 414, 422–423, 73 S.Ct. 369, 375, 97 L.Ed. 447 (1953), the Supreme Court stated:

"The Government, in its brief, argues strongly for the widest sort of discretion in the trial judge in these matters and urges that even if we find error or irregularity we disregard it as harmless and affirm the conviction. We are well aware of the necessity that appellate courts give the trial judge wide latitude in control of cross-examination, especially in dealing with collateral evidence as to character. * * * But this principle cannot be expanded to justify a curtailment which keeps from the jury relevant and important facts bearing on the trustworthiness of crucial testimony."

In *Gordon*, as in the instant case, counsel was attempting to focus his cross-examination on matters dealing with the credibility of the witnesses.

The necessity for full cross-examination is particularly acute when its purpose is to demonstrate the lack of credibility of an identification by attempting to determine whether or not the witness had recollection of specific characteristics of the defendant. It is axiomatic that the identification of a suspect at a much later time by witnesses who have seen the actual criminal on only a few occasions and then only for short periods is fraught with dangers because of the fallibility and suggestibility of human memory. As Mr. Justice Brennan stated in United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed. 1149 (1967):

"The vagaries of eyewitness identification are well-known; the annals of

---

1. Wigmore, as quoted in Lloyd Paul Stryker, The Art of Advocacy (1954) at 73.

2. The value of cross-examination has been demonstrated on countless occasions throughout legal history. One of the most famous of these was Sir Edward Carson's merciless cross-examination, in a libel suit at the Old Bailey, "which brought down the towering and shaky edifice known as Oscar Wilde." Alexander Woollcott, "The Archer-Shee Case," Law in Action (Amicus Curiae, ed.) (1947) at 169. Carson's cross-examination of Wilde is described at length in Stryker, *supra*, note 1, at 100–109. Other famous examples of cross-examination are described in Francis L. Wellman, The Art of Cross-Examination (1941) at 454–68, and in Stryker, *supra*, note 1, at 76–84.

criminal law are rife with instances of mistaken identification. Mr. Justice Frankfurter once said: 'What is the worth of identification testimony when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent— not due to the brutalities of ancient criminal procedure.' The Case of Sacco and Vanzetti 30 (1927). * * * *"

And further, in *Wade* at 229, 87 S.Ct. at 1933, quoting from Williams and Hammelmann, Identification Parades, Part I (1963), Crim.L.Rev. 479, 482:

" * * * '[i]t is a matter of common experience that, once a witness has picked out the accused at the line-up, he is not likely to go back on his word later on, so that in practice the issue of identity may (in the absence of other relevant evidence) for all practical purposes be determined there and then, before the trial.' "

Edwin M. Borchard's book *Convicting the Innocent* (1932) chronicles the stories of sixty-five persons who were convicted of crimes which it was later found they did not commit. Of those sixty-five, twenty-nine convictions were caused by mistaken identifications. Among these are the cases of Herbert T. Andrews where, amazingly enough, seventeen persons identified him as the criminal; Adolf Beck whom fourteen people identified; and Irving Greenwald whom five people identified. Similarly, Jerome and Barbara Franks's book *Not Guilty* (1957) tells the tales of numerous other innocent persons convicted of crimes. Among them, the convictions of I. L. Southerland and Ovid G. Mathis, Ernest E. Mattice, James A. Long, Nathan Kaplan, and Bertram Campbell were all brought about by mistaken

identifications. The *Campbell* case is especially similar to the case at bar. There Campbell, later proven to be wholly innocent, was convicted of forging four checks, after the bank president and three bank tellers, all of whom had seen him only briefly, positively identified him, both in person and in photographs, as the forger.[3]

In his book *The Art of Advocacy* (1954), Lloyd Paul Stryker commented on the *Campbell* case as follows:

"Cases of mistaken identity are always difficult, and yet I believe that had a great advocate been there, he would have cross-examined those identifying witnesses so as to search their consciences and even their souls. He would have shaken them as a terrier throws fear into a rat. Their smug assurance would have vanished; their complacent certainty would have weakened, and perhaps, who knows, they might have been forced to recant their false identification on the witness stand, even as they did seven years later" (p. 203).

The very thing spoken of by Mr. Stryker—a witness's recantation under the heat of intensive cross-examination—actually occurred in the famous *Archer-Shee* case in 1910 England.[4] In that case, thirteen-year-old George Archer-Shee was expelled from the Royal Naval College at Osborne for allegedly stealing a five-shilling postal order from a classmate and cashing it at the local post office. The boy denied stealing the order; but the postmistress testified positively that the boy who had cashed the stolen order was the same as one who had bought a postal order for fifteen and six, and her records showed the 15s. 6d. order to have been cashed by Archer-Shee. On cross-examination, the incomparable Sir Edward Carson challenged her certainty that the two boys were the same, until finally she admit-

3. The *Campbell* case is also described in Stryker, *supra*, note 1, at 197–204.

4. The history and prosecution of that case are fully related in Woollcott, *supra*, note 2, at 167–175. The case was later dramatized in "The Winslow Boy," which opened on Broadway in 1947.

ted, now that she came to think of it, that she could not be sure that the stolen order had been cashed by the same boy who had bought the order for 15s. 6d. After this, the Admiralty withdrew its complaint, and Archer-Shee was vindicated. While we cannot know whether the same sort of turnabout might have occurred here had the trial judge not cut off the defense counsel's cross-examination as to the witnesses' recollection of specific characteristics of the defendant, at the very least counsel was entitled to the fullest opportunity to shake the certainty of the identifying witnesses.

■ The government relies on the fact that the instant case, unlike the cases discussed above, was tried to a judge, rather than a jury; and it argues that for Judge Rayfiel to continue the cross-examination once he had become convinced of the government's identification testimony would have been a waste of time. We disagree. The absence of a jury should make no difference since a defendant must be allowed a full and fair opportunity to test and explore incriminating testimony. The primary issue in the case was the identification of Fitzpatrick; and the witnesses had seen Fitzpatrick on only a very few occasions, for very short periods of time, and either through a teller's window or from a distance. Moreover, there had been a thirty-month delay between arrest and trial, and the second photographic identification session took place only weeks before trial. In these circumstances, cross-examination going to the ability of the witnesses to observe and remember anything about the defendant was highly relevant and should have been allowed. There was no reason whatever for the Assistant United States Attorney to object to the questions put to the witnesses by defense counsel, and in our view, the judge should have overruled the objections and permitted the cross-examination to proceed.

The trier of fact, even though it was the judge, should have been permitted to see on what specific physical characteristics of the defendant the witnesses'

identification was based and how much of it was unsure. Even a judge who appears to have made up his mind on the basis of what he has heard may be moved to reasonable doubt in the light of what may develop from full cross-examination on relevant matters. Similarly, the two witnesses here should have been given the opportunity to reflect upon the difficulties of personal identification, the slimness of their contact, and the fallibility of human memory. As the *Archer-Shee* case so graphically demonstrates, such an opportunity, presented by a full cross-examination, can alter a witness's mind about his "positive" identification. Surely Fitzpatrick had the right to provide the witnesses here a similar chance to examine the basis for their certainty and the chance to change their view. For these reasons, Judge Rayfiel's restriction of the scope of defense cross-examination of Toma and Hoffman was unreasonable. Although the circumstantial evidence against Fitzpatrick was strong, that restriction cannot be said to be "harmless error," for the result conceivably could have been different if these witnesses had retracted their identification, or if it could have been shown that they were not certain.

Although we reverse and remand this case, we treat Fitzpatrick's four other claims, for they may arise on retrial.

■ The first of Fitzpatrick's other contentions is that he was denied his Sixth Amendment right to counsel under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed. 1149 (1967), since his counsel was not present at the post-indictment photographic identification session that took place several weeks prior to trial. He argues that photographic identifications are just as susceptible to prejudicial manipulation as line-ups and that when a defendant has already been indicted and is represented by counsel, the police should not be allowed to circumvent the *Wade* rule by resorting to photographic identifications. This Court has already rejected that argument in United States v. Ben-

nett, 409 F.2d 888 (2d Cir.), cert. denied sub nom. Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969). In that case we held that the right to the presence of counsel applies only when the defendant is actually confronted by witnesses in a pretrial identification, and not to photographic identifications from which the defendant is absent. See also United States v. Edmons et al., 432 F.2d 577 (2d Cir. 1970); United States v. Smith, 423 F.2d 1290 (9th Cir. 1970); McGee v. United States, 402 F.2d 434 (10th Cir. 1968), cert. denied 394 U.S. 908, 89 S.Ct. 1020, 22 L.Ed.2d 220 (1969); United States v. Collins, 416 F.2d 696, 699 (4th Cir. 1969), cert. denied 396 U.S. 1025, 90 S.Ct. 601, 24 L.Ed.2d 519 (1970).

■ Fitzpatrick's next contention is that the pretrial photographic identifications were impermissibly suggestive. In Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court held that

"convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971.

Fitzpatrick argues that since the majority of photographs were of older men whereas the witnesses had informed authorities that the suspect was a young "clean-cut American boy," the procedure was impermissibly suggestive. It was also impermissibly suggestive, claims Fitzpatrick, because during the second identification session, the three bank witnesses were in the same room when they *seriatim* picked Fitzpatrick's picture.

We reject this contention. Although fifteen of the eighteen photographs shown to the witnesses do not resemble the description of John Harrison given to the FBI agents before they assembled the sampling, three pictures do fit the Harrison description. Hence, Fitzpatrick's picture could not have been selected from among the latter photographs by persons who had not seen and remembered his face. Moreover, the government witnesses reconstructed the identification procedure with sufficient explicitness to afford defense counsel an opportunity to probe on cross-examination for conditions prejudicial to Fitzpatrick. Although, as we have held, the cross-examination of Toma and Hoffman was unreasonably curtailed when defense counsel was seeking to determine whether the witnesses could remember specific physical characteristics of the defendant, it was not so curtailed on his questioning as to whether the conditions at the photographic identification sessions were prejudicially manipulated so as to be impermissibly suggestive. Fitzpatrick's counsel could not uncover any such conditions, and indeed the witnesses' testimony shows the procedure to have been fair and nonprejudicial.

■ Fitzpatrick also contends that he was denied his Sixth Amendment right to a speedy trial since thirty months elapsed from the date he was arrested until the date he was eventually tried. At the present time, however, we are governed by the standards of United States ex rel. Solomon v. Mancusi, 412 F.2d 88 (2d Cir.), cert. denied 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969). As we stated in that case, "[t]his circuit has looked to four factors in deciding whether there has been a violation of the right to a speedy trial: (1) the length of the delay; (2) the reason for the delay; (3) the prejudice to the defendant; and (4) waiver by the defendant." 412 F.2d at 90.

■ Here the delay was of thirty months, whereas "dismissal has rarely been granted for a delay of less than several years." United States ex rel. Solomon v. Mancusi, *supra*, at 90. With respect to the reason for the delay, the appropriate test is whether the delay was caused by purposeful or oppressive governmental action. United States v. Dooling, 406 F.2d 192, 196 (2d Cir.),

cert. denied sub nom. Persico v. United States, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969). See also Pollard v. United States, 352 U.S. 354, 361–362, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957). Here there is no showing of such action; and besides there was a valid reason for delay since the case in-take in the Eastern District of New York during this period was rapidly increasing without a full quota of judges being appointed or available. Third, Fitzpatrick has made no showing that the delay was prejudicial to him, unlike the situation in Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970), where two witnesses had died and a third was unavailable to testify because of the delay, and where prejudice also occurred by the loss of police records. A mere allegation of the dimming of memory is not sufficient to establish the requisite prejudice. United States ex rel. Solomon v. Mancusi, *supra*, 412 F.2d at 90–91. See also United States ex rel. Von Cseh v. Fay, 313 F.2d 620, 624 (2d Cir. 1963). Finally, in any event, Fitzpatrick waived his right to a speedy trial by failing promptly to demand that right. United States v. Lustman, 258 F.2d 475 (2d Cir.), cert. denied 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958). See also United States v. Maxwell, 383 F.2d 437, 441 (2d Cir. 1967), cert. denied sub nom. Aiken v. United States, 389 U.S. 1043, 88 S.Ct. 786, 19 L.Ed.2d 835 (1968); United States v. Roberts, 408 F.2d 360, 361 (2d Cir. 1969); United States v. Parrott, 425 F.2d 972 (2d Cir. 1970), cert. denied, 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970).

■ Fitzpatrick's final contention is that it was reversible error for the district court to deny Fitzpatrick's motion pursuant to Rule 43, F.R.Crim.P., to waive his presence in the courtroom.

This contention finds no support either in Rule 43 or in the case law. Rule 43 permits a felony defendant whose trial has begun in his presence to be tried even though the defendant absconds.[5] It does not give a defendant a right to absent himself from the courtroom, especially when his identification is the focal point of his trial.

Reversed and remanded.

---

5. Rule 43, F.R.Crim.P., provides in pertinent part:

The defendant shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by these rules. In prosecutions for offenses not punishable by death, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict.