UNITED STATES of America,
Appellee,

v.

Sidney STEIN and Security Underwriting
Consultants, Inc., Defendants-
Appellants.

Nos. 490, 491, Dockets 71–1960, 71–2004.

United States Court of Appeals,
Second Circuit.

Argued Feb. 3, 1972.

Decided Feb. 25, 1972.

Frank G. Raichle, Buffalo, N. Y. (Raichle, Banning, Weiss & Halpern, Buffalo, N. Y., on the brief), for defendants-appellants.

Daniel J. Sullivan, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., Peter F. Rient, Asst. U. S. Atty., on the brief), for appellee.

Before ANDERSON and OAKES, Circuit Judges, and CLARIE,* District Judge.

OAKES, Circuit Judge:

This case raises a serious speedy trial question under the sixth amendment, in addition to questions regarding the statute of limitations and sufficiency of the evidence. Appellants Sidney Stein and Security Underwriting Consultants, Inc. (Security), of which Stein was half owner, were convicted of conspiracy in violation of 18 U.S.C. § 371; Stein was also convicted of manipulating the price of Buckeye Corporation stock, a security registered on the American Stock Exchange (Amex), contrary to 15 U.S.C. §§ 78ff(a), 78i(a) (2). Stein was fined $10,000 and sentenced to two years' imprisonment on the conspiracy count and was fined $10,000 and put on five years' unsupervised probation on the substantive count. Security, now a defunct corporation, was fined $1,000 on the conspiracy count.

The indictment originally contained 72 counts against 15 defendants, but as submitted to the jury it charged only four defendants in eight counts, on six of which (charging fraudulent sales of Buckeye stock to the public) Stein was acquitted. Two co-defendants were acquitted on all counts.

Trial commenced on May 5, 1971, under an indictment filed September 22, 1966, covering alleged criminal conduct engaged in from the spring of 1960 to the autumn of 1961. On October 31, 1961, trading in Buckeye stock was suspended.

Through the testimony of five co-defendants, twelve brokers and other witnesses and almost 2,000 documentary exhibits the government's proof was that Stein and his partner in Security, Leo Davis, who died three days after the trial commenced, through Security brought about a sale of some 603,000 shares of Buckeye stock while Buckeye was sustaining a $4 million operating loss. This was accomplished by artificially shoring up the price of the stock through purchases of small amounts on the exchange through different brokers and in different names, and by offering to brokers secret compensation to induce them to promote sales of Buckeye. A recital of the facts is necessary for an understanding of the arguments regarding delay and prejudice.

In the spring of 1960, Buckeye was controlled by one George Horvath and his family through Massachusetts Mohair Plush Corporation ("Massmo") and

---

* United States District Judge for the District of Connecticut, sitting by designation.

two of its wholly-owned subsidiaries. Buckeye was what might be called a baby conglomerate, involved in the manufacture and sale of camping equipment and chicken incubators, the operation of a series of canals and locks, and an acquisition program although heavily in debt to Massmo and others. Stein and Davis helped Buckeye acquire a leasehold interest in the Montmarte Hotel in Miami Beach, and Horvath agreed to treat Stein and Davis as preferred finders in connection with Buckeye's acquisitions if they would promote the sale of Buckeye stock. As a part of the scheme, according to Horvath, he was to furnish Stein with expense money to entertain and buy presents for brokers, and to provide vacation trips and throw parties for them, with attractive girls and liquor, as part of his operating expense.

In the summer and fall of 1960, Stein and Davis sold to the public 154,500 shares of Buckeye on behalf of two Massmo subsidiaries and Horvath's brother-in-law and 64,710 shares newly issued by Buckeye. During this same period they bought small amounts—usually 100 share lots—in the names of various nominees, 90 per cent of which were made at a slight increase in price—that is on the "plus tick"—from the previous trade of the day. This small lot buying raised the price quoted in the newspapers the following day. Orders were placed with different brokers to avoid suspicion. Stein also used his expense money to throw parties for brokers and to offer them secret compensation to induce their customers to buy Buckeye. Through these efforts the price of Buckeye was maintained at between 3 and 4 while the 219,000-plus shares were unloaded to the general public. For Stein's and Davis' efforts they received 15,000 shares of Buckeye stock as finder's fees on two acquisitions and other consideration, including the loan of $160,000 from Buckeye.

In the winter and spring of 1961, while Stein and Davis concentrated their promotional activity on the west coast, entertaining and compensating brokers

through one James Cravitz, a Los Angeles lawyer who died two years later, Stein also offered Frank Ebner of Banner Securities, a New York brokerage firm, 25 cents a share to sell Buckeye stock to his customers. During that spring the partners were successful in selling 330,400 Buckeye shares for Massmo as well as 27,584 shares on Security Underwriting's account and 3,800 shares previously bought by a nominee. The efforts were too successful, however, for at about the same time Massmo agreed to exchange $3.37 million owed to it by Buckeye for 1,392,552 shares of Buckeye stock at $2.25 per share; the artificial market price created by Stein and Davis embarrassed the Buckeye management since the market price was $3\frac{5}{8}$, and stockholder approval of the issue was needed. Stein, obligingly, promptly dumped enough stock on the market to drop the price to $3\frac{1}{4}$, at which point the Buckeye stockholders approved the exchange.

Buckeye, however, sustained a $3.8 million loss for the fiscal year ended April 30, 1961. Stein then asked Ebner of Banner Securities for help in selling Buckeye stock over-the-counter at prices determined by the Amex price, for which Ebner received a commission seven per cent higher than that disclosed in the prospectus (which also failed to disclose Buckeye's extensive operating losses). Banner was also paid 25 cents per share for each share it bought for Stein and Davis on the Amex and then resold. Meanwhile, on trades often made at the end of the day Stein and Davis were buying Buckeye on the exchange, still in nominees' names, in 100 or 200 share lots. From July through October 1961, purchases in accounts controlled by Stein, Davis and Horvath amounted to 72,600 shares, or 28.8 per cent of the daily exchange volume of Buckeye purchases. When trading was suspended by Amex authorities on October 31, 1961, the Buckeye price fell precipitously to 50 cents per share. By then Massmo had advanced to Stein, Davis and Security $293,000 in unsecured loans. After sus-

pension, the SEC began an investigation. One Hadfield, a customer's man in a brokerage house named as a co-defendant, testified at trial that Stein told him to conceal from the SEC Stein's orders in a nominee's name and, shortly after the indictment, told Hadfield and another broker that the case was a "witch hunt" and "would probably never go to trial," and that they should stick to their stories.

Appellants' principal claims of prejudice are based upon: (1) the deaths of Cravitz and Davis; (2) the loss of certain books and records; (3) the inability of a government witness to testify as to Amex rules and regulations in effect in 1960 and 1961; and (4) the fading memories of Horvath, who pleaded guilty and testified for the government, a government witness (Eugene Ross), who the defense contended took Stein's place before the statute of limitations began to run, and others (Lowenthal, a Miami broker, Ebner, the Banner chief), including Stein himself.

At the outset we note that appellants made no demand for trial until October 29, 1970, after a May 1971 date had been set, although they had been ready for trial in January 1969 before Judge MacMahon, who subsequently excused himself from the case.

At first blush, the lapse of time here involved—almost ten years from the last transactions complained of to the trial—might seem enough to constitute a denial of the sixth amendment guaranty of the right to a speedy and public trial.[1] The right to a speedy trial ". . . is as fundamental as any of the rights secured by the Sixth Amendment" and ". . . has its roots at the very foundation of our English law heritage." Klopfer v. North Carolina, 386

U.S. 213, 223, 87 S.Ct. 988, 993, 18 L.Ed. 2d 1 (1967) (speedy trial right violated by indeterminate threat of prosecution after *nolle prosequi*). *See also* Dickey v. Florida, 398 U.S. 30, 37–38, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970) (right violated by almost eight-year delay, with repeated demands by defendant for trial, death of two witnesses, unavailability of a third, loss of police records and "no valid reason" for delay); Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L. Ed.2d 607 (1969) (right applicable after demand by person already in jail on another charge).

At the same time the right is "necessarily relative," and we must look to the circumstances of each case, Beavers v. Haubert, 198 U.S. 77, 87, 25 S. Ct. 573, 49 L.Ed. 950 (1905). at least where the delay is not ". . . purposeful or oppressive." Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 471, 1 L.Ed.2d 393 (1957). The ". . . essential ingredient [in the administration of justice] is orderly expedition and not mere speed." Smith v. United States, 360 U.S. 1, 10, 79 S.Ct. 991, 997, 3 L.Ed.2d 1041 (1959). *See generally* United States v. Ewell, 383 U.S. 116, 120–121, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).

This court[2] is not alone in concluding that the right is a relative one. *Compare* United States v. Borman, 437 F.2d 44, 46 (2d Cir.), cert. denied, 402 U.S. 913, 91 S.Ct. 1394, 28 L.Ed.2d 655 (1971), with Evans v. United States, 130 U.S.App.D.C. 114, 397 F.2d 675, 676 (1968), cert. denied, 394 U.S. 907, 89 S. Ct. 1016, 22 L.Ed.2d 218 (1969). Speedy trial questions must be analyzed by examining four factors: (1) length of the delay; (2) reason for the delay; (3) prejudice to the defendant; and (4)

---

1. Appellants argue that the district court, in its discretion, should have dismissed the indictment under Fed.R.Crim.P. 48(b), for "unnecessary delay" in presenting the charge to a grand jury and in bringing them to trial, but they do not argue violation of the due process clause of the fifth amendment.

2. The Second Circuit Rules Regarding Prompt Disposition of Criminal Cases were not in effect until June 5, 1971, after the time of the trial herein. Generally speaking they would require trial within six months except when "exceptional circumstances" are shown. Rule 5(c) (ii), (h).

waiver by the defendant. United States ex rel. Solomon v. Mancusi, 412 F.2d 88, 90 (2d Cir.), cert. denied, 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969), followed in, *e. g.*, United States v. Fitzpatrick, 437 F.2d 19, 26–27 (2d Cir. 1970).

■ While the delay here is long enough to meet the first requirement for dismissal, mere delay without prejudice does not establish a violation of the sixth amendment. United States ex rel. Solomon v. Mancusi, *supra*, 412 F.2d at 90–91. There is no claim that the delay here was purposeful on the government's part. *See* United States v. Dooling, 406 F.2d 192, 196 (2d Cir.), cert. denied, Persico v. United States, 395 U.S. 911, 89 S.Ct. 1744, 23 L.Ed.2d 224 (1969). To the contrary, the very nature of this case—involving a complex course of conduct with hundreds or thousands of transactions in several states over a long period of time, with many witnesses and much documentary proof—furnishes some good reason for the delay. As in United States v. Orsinger, 138 U.S.App. D.C. 403, 428 F.2d 1105, 1114–1115, cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L. Ed.2d 61 (1970), where some five years elapsed between the date of the offenses and the indictment, the prosecution here ". . . resulted from an extended [also an SEC] investigation into the complicated and tangled affairs of the appellant and his corporations." Again, "[t]ime is needed for investigation and determination of the need for and extent of criminal charges to be brought, particularly in wide-ranging securities distribution schemes." United States v. Parrott, 425 F.2d 972, 975 (2d Cir.), cert. denied, 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970). To the extent that delay occurred after indictment, moreover, it was at a time in which the case take-in in the Southern District of New York was rapidly increasing without a full quota of judges appointed or available. *See* United States v. Fitzpatrick, *supra*, 437 F.2d at 27 (similar circumstances in Eastern District of New York).

To the extent that the delay here was between the time of the offense and the indictment, only recently the Supreme Court held that, absent a showing of prejudice or purposeful delay, there is no violation of the sixth amendment or the due process clause so long as there is compliance with the applicable statute of limitations. United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971).

We turn to appellants' specific claims of prejudice. Two of Stein's co-conspirators died, Cravitz while the SEC investigation was still in progress and Davis shortly after trial began. Davis, appellants claim, would have been available as a "source of information" in connection with the payment to Banner of secret compensation in the form of stock in American States Oil Company. If, as they claim, appellants were surprised that the government relied upon Ebner's testimony implicating Stein and Davis in the payment to Banner, they should have sought a bill of particulars, for Ebner was a named defendant. Moreover, there was testimony from one Sellich that Stein was present when Davis paid Sellich $300 for acting as a mail drop in a payment to Banner, and there was proof that he also acted as a mail drop for "Harold" and "Lawrence Rosenbloom," names in which stock destined for Banner's account was registered. Even without this American States Oil stock transaction there was ample evidence from five former brokers—Ebner, Sacks, Shanman, Rapp and Maher—who testified that Stein offered them cash compensation for Buckeye stock bought by their customers. Two Californians from large brokerage concerns, Ross and Leigh, also testified to receipt of secret payments for selling Buckeye stock, one testifying that he was mailed cash by Stein directly. In the light of this evidence, we fail to see how Davis' death prejudiced appellants.

As for Cravitz, he died shortly after the events complained of and long before any realistic trial date, so no prejudice

occurred from his decease. United States v. Parrott, *supra*, 425 F.2d at 976; *see* United States v. Alo, 439 F.2d 751, 754–756 (2d Cir.), cert. denied, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971).

A number of documents were not available as a result of the lapse of time. However, how the Security Underwriting books and records could have assisted the defense is not clear, since loans to Security from Massmo were shown by Massmo's books, and copies of agreements between Security and Buckeye as to Buckeye stock were supplied in Government's Exhibits 56 and 57. In any case, the Security books were lost in 1963 or 1964, before indictment. *Cf.* United States v. Parrott, *supra*, 425 F. 2d at 976.

The absence of the *original* underwriting agreement under which Banner sold Buckeye stock is said to have been prejudicial, but there was a copy of the agreement between Massmo and Continental Bond & Share Corporation, Banner's predecessor or principal. Moreover, it was secret compensation to Banner, not the compensation under the agreement, which was in issue. Missing customer ledger sheets and two blotter pages from Banner were in fact reconstructed from the rest of Banner's blotter and stock record by Banner's cashier, who also traced the American States Oil stock proceeds, so that the loss of this documentary material had no real effect (although there was some confusion as to what happened to those proceeds).

It is claimed that the witness Shanman, of the now defunct brokerage firm of Neil James & Co., could not in the absence of his books—which he hadn't seen since 1961—be cross-examined on his testimony about buying Buckeye late in the day so as to show an uptick. However, Government Exhibit 1726—devised from the records of the brokerage houses through which Neil James & Co. and others cleared their transactions—was available to show all end-of-day Buckeye stock transactions conducted by Neil James. We do not think the prejudice substantial.

Finally, appellant argues that Amex rules and regulations in 1960 and 1961 were not available at the time of trial, but there is no showing that this was in fact the case. A government witness who was directed to look them up didn't return to the court, but appellants made no effort to produce the rules, and they do not suggest that these would in any way have been helpful to them.

There were failing memories of some witnesses, a great problem with a trial occurring as long after the alleged criminal acts as this one. Recollection does, as one witness put it, "erode" after such a lapse of time, and examination on small points is made more difficult. Witnesses' testimony after such a lapse of time may have become "canned," *i. e.,* based upon what they said in a statement, not upon what actually occurred. A reading of the record, however, convinces us that appellants were probably helped as much as hurt by any memory lapses. *See* United States v. Feinberg, 383 F.2d 60, 66 (2d Cir. 1967), cert. denied, 389 U.S. 1044, 88 S.Ct. 788, 19 L. Ed.2d 836 (1968); *cf.* United States v. Alo, *supra*, 439 F.2d at 755. *See also* United States v. Smalls, 438 F.2d 711, 713 (2d Cir.), cert. denied, 403 U.S. 933, 91 S.Ct. 2261, 29 L.Ed.2d 712 (1971) (inability of government's witnesses to recall details goes to weight of testimony).

Appellants did not demand trial until October 29, 1970, after the case was assigned to Judge Bryan and a trial date in May of 1971 set. True, they had been ready for trial in January 1969 when Judge MacMahon excused himself. But, as one witness testified, Stein had thought the case would never be tried. One can only suppose that appellants believed they would benefit from any delay at least as much as would the government.

The absence of substantial prejudice and appellants' failure to seek an early trial bar assertion of a speedy trial

claim in this instance, where there is nothing to show "purposeful or oppressive" delay on the part of the government. Pollard v. United States, *supra*, 352 U.S. at 361, 77 S.Ct. 481; United States v. Persico, 425 F.2d 1375, 1385 (2d Cir.), cert. denied, 400 U.S. 869, 91 S.Ct. 102, 27 L.Ed.2d 108 (1970); United States v. Aadal, 407 F.2d 381, 382 (2d Cir.) (per curiam), cert. denied, 395 U.S. 967, 89 S.Ct. 2114, 23 L.Ed.2d 754 (1969).

■ Appellants further argue that the five-year statute of limitations, 18 U.S.C. § 3282, ran before the September 22, 1966, indictment was filed. However, at the end of September 1961 one California broker paid by Stein sold Buckeye stock to his customers.[3] One broker (Ross) was contacted by Stein "about a month or so before the stock was delisted" (which was on October 31, 1961), and "[s]omewheres about, I believe, October," Ross met with Stein, Horvath, Davis and a Mr. Lepento at the Buckeye offices where he was promised expenses and $1,000 per month as compensation for "getting brokers interested in Buckeye Corporation stock." He subsequently received two sets of airplane tickets and a $1,000 check but did nothing "because a short time thereafter the stock was delisted . . . ." On October 6, 1961, one payment for Buckeye purchases was made by Massmo to Ebner and another was made on October 5, 1961, to Betta Investment Corporation, with which Cravitz was associated, both payments arranged by Stein. While the evidence of a continuing course of conduct after September 22, 1961, was slender, we hold that it was sufficient to take the case without the bar of the statute.

■. Appellants finally argue, apparently for the first time, that there was insufficient evidence to sustain the conviction under Section 9(a) (2) of the Securities Exchange Act of 1934, 15 U.S.C. § 78i(a) (2), which makes it unlawful to use a facility of a national securities exchange:

> To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

■ The purpose of the statute is to prevent rigging of the market and to permit operation of the natural law of supply and demand. Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 792–796 (2d Cir. 1969), cert. denied, 400 U.S. 822, 91 S.Ct. 44, 27 L.Ed.2d 50 (1970). Here there was proof of "creating actual or apparent active trading in" and of "raising or depressing the price of" Buckeye Corporation stock, although proof of either would have been sufficient. 3 L. Loss, Securities Regulation 1549–55 (2d ed. 1961). The activity in Buckeye stock that the public saw was, in the Senate Report's apt imagery, "a mirage" rather than "the reflection of a genuine demand." Senate Comm. on Banking & Currency, Stock Exchange Practices, S.Rep. No. 1455, 73d Cong., 2d Sess. 54 (1934). *See* Thornton v. SEC, 171 F.2d 702 (2d Cir. 1948) (*per curiam*). Appellants claim that Stein was merely "pegging" or "stabilizing" the price of Buckeye stock, a practice said to be legitimate under SEC rules. 2 CCH Fed.Sec.L.Rep. ¶ 22,614. However, "stabilization" is prohibited by SEC Rule 10b–7(g) in a case such as this one, where the offering price is determined by the market price. Where stabilization is permitted there must be disclosure in the prospectus and daily reports filed under SEC Rules 10b–7(k), (l) and 17a–2, neither of which occurred here. 17 C.F.R. § 240.10b–7; 17 C.F.R. § 240.17a–2. This was manipulation,

---

3. The government claims that "at the end of September" Stein told another broker, one Meyer, that the stock was going to move, but Meyer's testimony was "I don't know if it is exactly in September or somewhere near there. . . ."

pure and simple, under 15 U.S.C. § 78i(a) (2). *See* United States v. Re, 336 F.2d 306, 309–310 (2d Cir.), cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L. Ed.2d 177 (1964); United States v. Minuse, 142 F.2d 388, 389 (2d Cir.), cert. denied, 323 U.S. 716, 65 S.Ct. 43, 89 L. Ed. 576 (1944); R. J. Koeppe & Co. v. SEC, 95 F.2d 550 (7th Cir. 1938) (paying touts to recommend security). *See also* Note, Manipulation of the Stock Markets Under the Securities Laws, 99 U.Pa.L.Rev. 651 (1951); Note, Regulation of Stock Market Manipulation, 56 Yale L.J. 509 (1947).

Judgment affirmed.