**UNITED STATES ex rel. James A. WALKER, Petitioner-Appellant,**

v.

**Robert J. HENDERSON, Superintendent of Auburn Correctional Facility, Respondent-Appellee.**

No. 490, Docket 73–2163.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 1973.

Decided Jan. 7, 1974.

Eleanor Jackson Piel, New York City, for petitioner-appellant.

Burton Herman, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., of the State of New York, Samuel A. Hirshowitz, 1st Asst. Atty. Gen., on the brief), for respondent-appellee.

Before WATERMAN and FEINBERG, Circuit Judges, and GURFEIN, District Judge.*

FEINBERG, Circuit Judge:

In April 1969, after a jury trial, James A. Walker was convicted in Supreme Court, Bronx County, New York of rape and sexual abuse in the first degree, incest, assault in the third degree and two counts of endangering the welfare of a child. The charges arose from appellant's alleged molestation of his 12 year old daughter Diane. Sentenced to concurrent terms of up to 25 years in prison, Walker appealed without success [1] and thereafter sought collateral review, which the Bronx Supreme Court refused without a hearing.[2] Having exhausted his state remedies, appellant petitioned the United States District Court for the Southern District of New York for a writ of habeas corpus. He now appeals from the order of Judge Dudley B. Bonsal denying the application after a hearing. We find no constitutional error, and therefore affirm the decision of the court below.

## I

Appellant first contends that the incompetence of appointed counsel deprived him of his sixth and fourteenth amendment rights to adequate representation. Initially, Walker was defended by William Harrison of the Legal Aid Society. In December 1968—11 months after appellant's arrest [3]—the Society was relieved as counsel and replaced by James P. Maniatis, assigned by the Appellate Division. Appellant complains that the mistakes and defaults of those two attorneys combined to render his representation "woefully inadequate," United States v. Currier, 405 F.2d 1039, 1043 (2d Cir.), cert. denied, 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228 (1969), and hence unconstitutional.

■■ It has long been clear that tactical errors or strategic miscalculations by counsel afford no constitutional grounds for relief. United States v. Garguilo, 324 F.2d 795, 797 (2d Cir. 1963). In order to infringe the constitution,

> [a] lack of effective assistance of counsel must be of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice.

United States v. Wight, 176 F.2d 376, 379 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950); United States ex rel. Crispin v. Mancusi, 448 F.2d 233, 237 (2d Cir.), cert. denied, 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed.2d 288 (1971). We have carefully considered all of Walker's allegations with respect to his attorneys' performance. Although counsel here were scarcely Clarence Darrows, Maniatis—if not Harrison—provided a colorable defense. Appellant's case does not, therefore, give rise to a valid claim of inadequate legal assistance under the extremely stringent standard laid down in *Wight*, supra.

Walker has mounted a blunderbuss attack on the quality of his representation

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. The Appellate Division affirmed his conviction, People v. Walker, 313 N.Y.S.2d 634 (1st Dep't 1970) (mem. dec.), and the New York Court of Appeals denied review.

2. The Appellate Division dismissed the appeal, People v. Walker, 326 N.Y.S.2d 715 (1st Dep't 1971) (mem. dec.), but indicated: "We have nevertheless considered the appeal on its merits and, were we not dismissing the appeal, we would affirm the order." Id. at 716. The New York Court of Appeals denied review.

3. The alleged crime occurred in the early morning hours of January 18, 1968. Appellant was arrested at his home a few days later.

both before and during trial. As examples of neglect or incompetence, appellant cites such things as his attorneys' alleged failure: to investigate leads furnished by Walker himself; to interview his daughter Diane (the complaining witness) prior to the date of trial; to call favorable witnesses to the stand; to demand a preliminary hearing; to understand the function of a *Huntley* hearing and utilize it properly; to object that the court lacked jurisdiction; and to provide effective advocacy on behalf of the client at trial. We now proceed to evaluate each of these charges in turn.

The chief investigatory default attributed to counsel was the alleged omission to follow up appellant's report—first communicated two months after his arrest—that his daughter had recanted her accusations in the presence of her mother (appellant's wife) and her aunt, Mrs. Helen Morgan.[4] Such evidence, if it existed, would clearly have been crucial. The case against appellant rested largely on the testimony of the girl Diane, corroborated by her younger brother Michael.[5] Moreover, the basis of appellant's defense was a challenge to his daughter's credibility. Taking the stand to deny the sex-related charges,[6] he sought to impugn the girl's veracity by claiming that she was lying out of anger because he had punished her for stealing and cashing his unemployment check. Under these circumstances, wholly to ignore appellant's lead might well have been inexcusable. At the hearing before Judge Bonsal, however, Maniatis testi-

fied that he had spoken with appellant's wife at the time of trial and that she had refused to give any evidence of the girl's alleged retraction or of her character for veracity.[7] Maniatis also stated that he had interviewed Mrs. Morgan, who likewise declined to testify to the daughter's reputation for telling the truth.[8] Since counsel's story was credible, the district judge would have been entitled to find that Maniatis had tried to some extent to pursue the recantation issue, potentially so vital to appellant.

Appellant's further illustrations of supposedly inadequate representation may be dealt with somewhat more summarily. It is true that neither Harrison nor Maniatis ever saw the complaining witness Diane prior to the day of the trial, but an investigator from Legal Aid spoke to her in August 1968. His report reveals that the girl was adhering to the story that Walker had molested her sexually and forced her brother to do the same. In addition, she told the interviewer that appellant had been having relations with her since she was nine years old. Although more diligent counsel would have followed up the report with a personal talk, one cannot say that the investigation which was undertaken accomplished nothing at all.[9] It is also true that trial counsel Maniatis rejected several potential witnesses who, Walker believes, would have aided in his defense;[10] these were Mrs. Walker (the wife), Mrs. Morgan (her sister) and Howard Ramhold (his brother-in-law). As previously indicated,[11] however, neither of these two women would have

4. Mrs. Morgan is now deceased.

5. The girl and boy were 12 and ten, respectively, at the date of the alleged crime, and 14 and 11 by the time of trial.

6. Walker admitted striking his daughter with his belt on two occasions.

7. Maniatis had subpoenaed Mrs. Walker, who was in a mental hospital at the time of trial and was brought to court by her attendant.

8. Mrs. Morgan, like Mrs. Walker, had been subpoenaed. Although Maniatis did not apparently ask her directly about the daughter's "recantation," the negative results of

his inquiry concerning character evidence sufficiently support the conclusion that the aunt would not have aided appellant even if she had been questioned with greater skill.

9. We note that Maniatis, too, used an investigator (whose services were obtained on counsel's motion) to help establish Walker's case. This operative's report describes an unavailing attempt to substantiate an alibi suggested by appellant.

10. Ultimately, only appellant himself and a physician who had examined the daughter, Dr. Kyung Kim, testified for the defense.

11. See text accompanying notes 7 and 8, supra.

helped appellant at all. Moreover, Maniatis testified at the hearing before Judge Bonsal that Ramhold, who was supposed to give evidence regarding the daughter's theft of the unemployment check, denied any knowledge of the matter when he appeared at the trial under compulsion of process. We would only add that the decision to call or bypass particular witnesses is peculiarly a question of trial strategy, United States v. Matalon, 445 F.2d 1215, 1219 (2d Cir.), cert. denied, 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 93 (1971), which courts will practically never second-guess.[12] See *Garguilo, supra,* 324 F.2d at 797.

■ Appellant also complains of the failure of counsel to demand a preliminary hearing. It appears, however, that appellant was sent to Bellevue for a mental examination on the same day as his arraignment—January 22, 1968; he was returned to court on February 6. Clearly, no hearing could have been scheduled during appellant's hospital stay. Only two days after his release from Bellevue, the indictment was handed down. At this point, the issue of probable cause was moot, and the right to a hearing had ended. People v. Jackson, 48 Misc.2d 1026, 266 N.Y.S.2d 481 (Sup.Ct.N.Y.Co.1965). There is nothing in the record to indicate that an inquiry into Walker's mental condition was not, at the time, at least as much in appellant's interest as a challenge to probable cause.

As a further point, appellant contends that counsel improperly advised him to take the stand at a *Huntley* hearing[13] despite the fact that the prosecution did not offer any statements to be used in evidence against him. But the record reveals that the arresting officer, Detective Farrell, did allude at the hearing to "questions" he had posed to Walker, which the latter had answered. (Indeed, at the trial, the officer testified to some of appellant's alleged remarks, such as: "I'm a father. I can assult my daughter.") Walker, through his present counsel, appears to object to Maniatis's failure to cross-examine Detective Farrell on the content of these oral "statements." (Instead, the attorney questioned appellant himself about his responses to Farrell.) Although this tack may reveal something less than consummate judgment, Maniatis did zero in several times on the heart of the *Huntley* inquiry: the voluntariness of the statements—which in this case hinged on whether and when *Miranda* warnings had been given. Contrary to Walker's contention that counsel had no idea of the purpose of a *Huntley* hearing, Maniatis showed at the hearing before Judge Bonsal that he understood its basic function of determining the voluntariness of defendant's admissions.[14]

Appellant additionally attacks his lawyers' failure to object to jurisdiction in the Bronx Supreme Court on the ground that the Family Court Act at the time vested

> exclusive original jurisdiction over any proceeding concerning acts which would constitute disorderly conduct or an assault between . . . parent and child . . .

in the Family Court. N.Y.Family Court Act § 812 (McKinney's Consol.Laws 1963). Later, we refer to this thorny jurisdictional point again in a somewhat

---

12. In addition, since both Ramhold and Mrs. Walker (see note 7, supra) were inmates of mental institutions at the time of appellant's trial, counsel might in any event have chosen not to call either or both of them because of their possibly poor credibility.

13. The term "*Huntley* hearing" refers to the New York procedure upon a motion to suppress a confession or admission alleged to have been made involuntarily. See N.Y.

Code of Cr.Proc. § 813–f, 813–g, 813–h (McKinney's Consol.Laws Supp.1969), superseded by N.Y.C.P.L. Art. 710 (McKinney's Consol.Laws, c. 11–A 1971), effective Sept. 1, 1971.

14. After some initial confusion, Maniatis stated: "You go ahead and make a motion to see if the Miranda warnings had been given," and then: "That [*Huntley*] hearing was to determine whether he [Walker] was given the Miranda warnings."

different context.[15] Suffice it to say for the moment that—whatever the present status of New York law on this issue—the state of the law was less than clear in 1969 when Walker was arrested, indicted and tried.[16] Thus, any mistake by counsel in this regard would hardly rise (or fall) to the level of constitutionally inadequate performance. Finally, appellant attacks the overall quality of Maniatis's representation at trial. We do not agree with Walker that "[a] reading of the summation of the petitioner's lawyer at the close of the case would indicate a low coefficient of advocacy. . . ."[17] We would also note that the trial judge commented during the proceedings:

> I have sat on a great many cases. I can tell you that I have been very impressed, both with the ability and with the diligence of Mr. Maniatis, and I think he is defending [appellant's] cause with a zeal and a dedication which you rarely see.

Having scrutinized all of appellant's charges set forth above (as well as others not meriting discussion), we find "that neither individually nor collectively do they give rise to a meritorious claim of ineffective assistance of counsel . . . ." United States v. Sanchez, 483 F.2d 1052, 1058 (2d Cir. 1973). More to the point, the court below certainly did not commit clear error in arriving at a similar conclusion, based on its resolution of disputed factual issues. United States v. Pfingst, 490 F.2d 262, 273 (2d Cir. 1973).

## II

As a second ground for reversal, appellant claims a denial of his right to a speedy trial. This argument need not detain us for long. The Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972), identified four factors for courts to weigh in determining the merits of particular claims of deprivation. These are "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (Footnote omitted.) Id. at 530, 92 S.Ct. at 2192. See also United States v. Fasanaro, 471 F.2d 717 (2d Cir. 1973); United States v. Stein, 456 F.2d 844, 847–848 (2d Cir.), cert. denied, 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972).

Although Walker himself clearly asked to be tried promptly,[18] the balance of the other three factors inclines against him. The delay was 15 months. Compare Barker, supra (lapse of over five years; conviction affirmed). Moreover, appellant—or his attorneys acting on his behalf—were responsible for much of the passage of time. On several occasions, Walker asked for the appointment of an "Appellate Division lawyer" in lieu of Legal Aid. After the case had already been scheduled for trial,[19] Harrison moved in September 1968 for a transfer of the matter to Family Court. The motion was granted, and more than a month went by until the Family Court declined to accept jurisdiction. Then, following Maniatis's appointment in December 1968, much time was spent in disposing of pretrial motions.[20] In addition, counsel requested several adjournments.

As for prejudice, 15 months of imprisonment prior to trial is not a matter to be taken lightly. The guarantee at issue here "is an important safeguard to prevent undue and oppressive incarceration . . . ." United States v. Ewell,

15. See Part III infra.

16. Cf. United States ex rel. Herrington v. Mancusi, 415 F.2d 205, 209–211 (2d Cir. 1969), and the New York cases cited therein.

17. Appellant's brief at 27.

18. In addition to moving to dismiss for lack of prosecution in September 1968, appellant wrote personal letters to the state court complaining, among other things, of the delay in trial.

19. On August 14, 1968, the trial was set for September 9. (It ultimately took place in April 1969.)

20. Maniatis filed a number of motions on appellant's behalf, of which one—requesting the appointment of an investigator—was granted.

383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966). But other aspects of prejudice that may arise from delay —notably, harm to the defense at trial —are absent here. *Barker, supra,* 407 U.S. at 532, 534, 92 S.Ct. at 2182. The passage of time appears to have had its major effect in dimming the recollection of the chief prosecution witnesses, Diane and Michael Walker. Maniatis took care to exploit this failure of memory in his closing speech to the jury. Under the circumstances, we hold that appellant was not denied a speedy trial in violation of the constitution.

### III

■ Appellant further contends that section 812 of the Family Court Act (McKinney 1963) (the "Act"), which confers "exclusive original jurisdiction" over intra-family assaults on the Family Court, deprived the Bronx Supreme Court of power to hear the case.[21] He argues that his trial in the face of this statute resulted in a void conviction and violated due process.

Initially, we note that the Appellate Division has apparently passed on appellant's jurisdictional claim, and rejected it.[22] Moreover, New York law on this subject is scarcely free from doubt, either on the question of the Act's coverage of specific crimes[23] or on the issue of the effect of joinder of different offenses in one indictment.[24] Because of the law's uncertainty, we cannot say with any assurance that the Bronx Supreme Court erred in trying appellant's case. However, we find it unnecessary to attempt to divine the proper state court construction of the statute[25] since further consideration compels our rejection of appellant's due process claim in

21. N.Y.Family Court Act § 813 (McKinney 1963) provides for the transfer of [a]ny criminal complaint charging . . . an assault between parent and child . . . by the criminal court in which [the] complaint was made to the family court in the county in which the criminal court is located . . . .
Under § 814, the Family Court may, at its discretion, remand the case "to an appropriate criminal court, if it concludes that the processes of the family court are inappropriate." Sections 812–814 were modified slightly on September 1, 1969 after appellant's conviction. (McKinney Supp.1973). All references in the text are to the words of the statute at the time of appellant's arrest, trial and conviction.

22. See note 2, supra.

23. Although it is clear that felonious assault falls within § 812, People v. Johnson, 20 N.Y.2d 220, 282 N.Y.S.2d 481, 229 N.E.2d 180 (1967), whereas incest does not, People v. Lewis, 29 N.Y.2d 923, 329 N.Y.S.2d 100, 279 N.E.2d 856 (1972) (per curiam), we have not found any decision that deals with the jurisdictional question in the context of charges of rape or endangering a child's welfare. Lower court cases have held that sexual abuse and sodomy were not covered by the Act. People ex rel. Doty v. Krueger, 58 Misc.2d 428, 295 N.Y.S.2d 581 (Sup.Ct. Nassau Co. 1968) (sexual abuse, sodomy); People v. Fuentes, 51 Misc.2d 354, 273 N.Y.S.2d 321, (Sup.Ct. Queens Co. 1966). But cf. People v. Nuernberger, 25 N.Y.2d 179, 303 N.Y.S.2d 74, 250 N.E.2d 352 (1969) (intent to commit incest does not deprive Family Court of exclusive original jurisdiction over felonious assault).

24. People v. Fowlkes, 24 N.Y.2d 274, 287, 300 N.Y.S.2d 89, 99, 248 N.E.2d 8, 15 (1969), one of three related cases reported under the title People v. Williams, held that
when assault and non-assault charges are inextricably related by a common element in the offenses, and not otherwise, the transaction lies in the first instance within the jurisdiction of the Family Court.
By "common element," the Court of Appeals apparently meant a legal rather than factual link: *Fowlkes* itself refused to sustain New York Supreme Court jurisdiction over burglary and weapons charges connected with an intra-family assault, where both these crimes depended "on the assault, or the intent to commit it, as the only element of criminal conduct charged in the indictment." Id. at 286, 300 N.Y.S.2d at 98, 248 N.E.2d at 14. The *Fowlkes* test seems rather hard to apply in specific factual settings. For example, it is not clear whether rape and sexual abuse in the first degree (of which appellant was accused and convicted) would fall within the ·Act because they depend on "forcible compulsion," i. e., assault, N.Y. Pen.L., McKinney's Consol.Laws, §§ 130.35, 130.65, or outside it because the underlying acts are criminal even without the assault—although not in the same degree. N.Y.Pen. L. §§ 130.30, 130.60.

25. Cf. People ex rel. Herrington v. Mancusi, supra note 16, 415 F.2d at 211.

any event. As we have previously mentioned, the complaint here was transferred to Family Court some eight months *after* indictment at Walker's counsel's request. Ultimately, the Family Court declined jurisdiction and sent the case back to the court of origin. While this belated move did not—under New York law—cure the jurisdictional flaw, if any,[26] it highlights the absence of any such prejudice to appellant as would be required for a finding of *constitutional* error. Whether or not the precise form of the law was followed, its underlying spirit was served. Appellant received all to which he was arguably entitled: a review of his case by the Family Court and a determination—negative here—of the propriety of civil adjudication of the crimes with which he was charged.

Since we have found no merit in any of the arguments raised on appeal, we affirm the judgment of the district court denying appellant's petition.

---

26. People v. Berger, 40 A.D.2d 192, 338 N.Y.S.2d 762 (3d Dep't 1972); People v. Boyce, 55 Misc.2d 53, 284 N.Y.S.2d 358 (Sup. Ct. Queens Co. 1967).