**UNITED STATES of America,**
**Appellee,**

v.

**Gabriel INFANTI and Nathan Kurtz,**
**Appellants.**

**Nos. 457, 458, Dockets 72–2086, 72–2087.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 13, 1972.

Decided Feb. 27, 1973.

**524**

Henry J. Boitel, New York City, for appellant Infanti.

John L. Pollok, New York City (Lenefsky, Gallina, Mass, Berne & Hoffman, New York City, on the brief), for appellant Kurtz.

Harold F. McGuire, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., S. Andrew Schaffer, Howard Wilson, John W. Nields, Jr., Asst. U. S. Attys., of counsel), for appellee.

Before KAUFMAN, ANDERSON and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Appellants were convicted on August 15, 1972, of the offense of transportation in foreign commerce of four stock certificates, knowing the certificates to have been stolen, in violation of 18 U.S. C. § 2314 and § 2. The certificates were small in number but large in value: one certificate was for 29,371 shares of American Telephone & Telegraph stock and three certificates were for a total of 15,274 shares of Boeing stock; the aggregate market value was about $2 million. Conviction was after a trial by jury, and each appellant received two-year suspended sentences and a $5,000 fine. They argue insufficiency of the evidence, improper venue in the Southern District of New York, and, an argument we hear quite often, lack of a speedy trial under the sixth amendment.

The four certificates were registered in the street name "Cede & Co." used by the Stock Clearing Corporation, a subsidiary of the New York Stock Exchange. They were stored at one of the Stock Clearing Corporation's vaults, either in its building at 44 Broad Street, New York, or at one of nine other locations. Periodic inventories revealed that the AT&T certificate was missing on September 5, 1969, and the Boeing certificates were missing on September 19, 1969. After further searches failed to reveal the certificates, a notice was sent out on September 30 to members of the exchange that these certificates were missing.

Meanwhile, on September 27, two round-trip tickets were purchased at Newark for appellants Kurtz and Infanti to travel via TWA Flight 740 on the 28th from Kennedy Airport to Frankfurt, Germany; the return trip was open-ended, i. e., no specific date or flight for the return was reserved. A Telex message was sent by co-defendant Joseph Seiller to a Max Sperber, informing him of the arrival on the 29th in Frankfurt at 8:15 a. m. of "Mr. Gabriel Infanti" on the specific TWA flight. The Telex went on to state that Infanti "has been instructed to expect to be picked up at the airport by you"; that he would bring with him the four certificates, "endorsed in blank according to law," along with a "corporate resolution showing that the president of the owner's corporation is authorized to sign these certificates"; that Infanti was supposed to receive $825,000 (U.S.) or "40 per cent of Monday market quotation whichever is higher in cash or bankers draft and fly back." The Telex was sent under the cable address ORFICOEAST, an acronym for Organization for International Finance and Commerce or Orfico International, Inc., a firm of which Seiller was president and the letterhead of which contained a Grand Central Station post office box and a Manhattan telephone number. The cable went on to give instructions on how the proceeds of the sale of blue chip stocks at a 60 per cent discount were to be divided and also warned Sperber not to disclose too much information to Infanti so as "to avoid that [sic] he can walk into some office in [Frankfurt] and make a deal without our knowledge."

Kurtz, a New Jersey lawyer, and Infanti arrived in due course and checked into the Frankfurter-Hof Hotel, obtaining a relatively small room, Room 407. There they were joined by Sperber and his prospective customer, one Abdul Chbib, who according to a German police inspector, ran "a sort of agency for a sheikdom," and ultimately by a Helmut Moerth, who was Chbib's representative at the Frankfurt office of Merrill Lynch, Pierce, Fenner & Smith. Sperber discussed with Moerth whether it was possible to sell "certificates in Mr. Chbib's account with Merrill Lynch which were not made out in Mr. Chbib's name." Moerth said this was theoretically possible, but he would have to check the certificates to see whether they were in negotiable form and that he would like to check the certificate numbers. He was shown the certificates bearing handwritten endorsements by Cede & Co. and "president Ralph something." He was also shown two plain pieces of paper without any letterhead, one of which said that the bearer was empowered to sell the certificates, and the other specifically that these certificates could be sold in the name or in the account of Mr. Chbib. The letters purported to be signed by Cede & Co. by its president, and—despite the fact that Cede & Co. was not a corporation—purported to bear a corporate seal. When Moerth started to write down the certificate members, Infanti retrieved the certificates and said, "No, I have to get in touch with my principals before I can allow you to do this." Later in the day Chbib and Sperber went to Moerth's office with a paper on which the certificate numbers and share amounts were listed. Merrill Lynch proceeded to check them by cabling their New York office which then contacted the Stock Clearing Corporation which in turn issued on Tuesday, September 30, its previously described "Lost Securities Notice" and an order preventing transfer of the certificates.

Infanti and Kurtz went to London, checked into a hotel without advance reservations, telephoned Chbib on the 30th, stayed a few days, exchanged their Frankfurt-New York return tickets for London-New York tickets, and upon their arrival at Kennedy on October 3 were arrested and searched. Neither had the certificates. On being interrogated, Kurtz denied that he had ever had the certificates in his possession and falsely stated that he had left New York on September 25 and gone to England on the 26th. One of the defendant's own exhibits, a letter from Seiller of ORFICO to one Scholz in Wiesbaden written on September 29 said in part, "Today you should be busy with the clients of our member being in Frankfurt to sell their shares and you should be able to collect the various amounts of money which we have given instructions to Mr. Sperber to pay."

## I. *The Sufficiency of the Evidence.*

The recital of the facts above is enough to answer appellant Infanti's argument that the evidence against him was insufficient because it showed him to be "merely a messenger" having "no substantive knowledge of the transaction." The jury may be taken to have inferred that Infanti, acting as Seiller's agent, was to transfer $2 million in certificates of two major listed companies and receive in return less than 40 per cent of their value. From Infanti's possession of the stolen certificates without a reasonable explanation the jury was entitled to infer that he knew the certificates were stolen. United States v. Minieri, 303 F.2d 550, 554–555 (2d Cir.), cert. denied, 371 U.S. 847, 83 S.Ct. 79, 9 L.Ed.2d 81 (1962). This is not a case where the defendant made any showing that the transportation of securities was a regular part of his occupation, *see* Freije v. United States, 386 F.2d 408 (1st Cir. 1967), cert. denied, 396 U.S. 859, 90 S.Ct. 129, 24 L.Ed.2d 111 (1969), so as to dispel the inference that he knew these particular certificates were stolen. Furthermore, Infanti's guilty knowledge may also be inferred from the facts that the sale was to be at

such a large discount from the market price, *cf.* United States v. Rosenthal, 454 F.2d 1252, 1254 (2d Cir.), cert. denied, 406 U.S. 931, 92 S.Ct. 1801, 32 L.Ed.2d 129 (1972), that Infanti quickly withdrew the certificates from Moerth when the latter started to copy down the certificate numbers, that the accompanying documents were of a questionable nature and that the overall circumstances of a sale of large listed companies' stocks to a representative of an Arab sheikdom in a Frankfurt, Germany, hotel room were surreptitious. *Cf.* United States v. DeKunchak, 467 F.2d 432, 436 (2d Cir. 1972).

■ The question of the sufficiency of the evidence as to Kurtz is, however, far more difficult. In this regard it is of the utmost importance to bear in mind that a conspiracy count against Kurtz was *dismissed* and the Government withdrew an aiding and abetting charge, 18 U.S.C. § 2, so that Kurtz's conviction was solely on the *substantive* charge of transporting stolen securities, 18 U.S.C. § 2314. From the evidence, viewed in the light most favorable to the Government, the jury could have inferred that Kurtz accompanied Infanti to Frankfurt, was in the hotel room in Frankfurt during the discussion with Sperber, Moerth and Chbib, and then hurriedly and without pre-planning went to London with Infanti after the negotiations for the sale of the stolen securities had broken off. But there is a total lack of evidence that Kurtz had actual possession of the stolen stock certificates at any time, and thus the inference of knowledge that the securities were stolen raised by possession applicable to Infanti is not applicable to him. Nor can the inference be raised by arguing, as the Government seeks to argue, that Kurtz was in constructive possession of the stolen securities. There was no evidence that Kurtz could set the price for the securities, that he had the final say as to their means of transfer or that he was able to assure their delivery. Proof of at least one of these indicia of dominion and control is necessary before a finding of constructive possession can be made. *See* United States v. Steward, 451 F.2d 1203, 1207 (2d Cir. 1971); United States v. Febre, 425 F.2d 107, 111 (2d Cir.), cert. denied, 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970). Kurtz's presence in the room with the stolen securities is not sufficient to establish his actual or constructive possession of them. *Cf.* United States v. Kearse, 444 F.2d 62 (2d Cir. 1971).

■ Thus, the Government must rely on evidence other than Kurtz's actual or constructive possession to establish that he knew the securities were stolen. It is true that the circumstances of the proposed stock transfer were surreptitious and it would have been obvious to Kurtz, a lawyer, that Infanti's dealings were less than legitimate. But Kurtz's presence in the hotel room and the lack of evidence of his participation in the conversations that occurred there—at some point Infanti said to him, "Not now, Nat," or words to that effect—do not establish the conclusion beyond a reasonable doubt that he was aware that the securities were stolen. *Cf.* United States v. Garguilo, 310 F.2d 249, 253 (2d Cir. 1962); United States v. Minieri, *supra*, 303 F.2d at 557 (aiding and abetting not proven from presence where an illegal act occurs). Without some further evidence of the quality of his participation, Kurtz's presence where illegal activity was being transacted does not establish his knowledge of the nature of the activity. *See* United States v. Cianchetti, 315 F.2d 584, 588 (2d Cir. 1963). The trip to London, as unplanned as it may have been, could have been at Infanti's insistence without explanation to Kurtz about the aborted transfer of stolen securities. Kurtz made no attempt to hide his activities in London (or in Frankfurt for that matter) as might be expected were he aware of the illegal purpose of Infanti's European trip. While phone calls were placed to Chbib from London, there is no evidence that Kurtz placed them. There was a reference in a Telex by Seiller to his agent Scholz on September

29 to "clients," but this is not sufficient to establish Kurtz's guilty knowledge, for there is no evidence that the "clients" referred to included Kurtz or that the "clients" had any knowledge the securities were stolen. Finally, Kurtz's false exculpatory statement given to an Assistant United States Attorney that he. was in Germany on September 26 as opposed to September 29—even though made only a few days later—may well have been a simple mistake in light of the fact that Kurtz apparently made no other efforts to conceal his European activities. *Cf.* United States v. Euphemia, 261 F.2d 441, 442 (2d Cir. 1958). When viewed in that light, the exculpatory statement is insufficient to establish a jury question on Kurtz's guilt.

Kurtz's conviction is therefore reversed. Since we have found the evidence of Infanti's. guilt sufficient, however, we must consider the other issues raised by him.

## II. *Venue.*

■ The venue question presents some difficulty since prosecution was undertaken in the Southern rather than the Eastern District of New York. The statute, however, permits venue to be laid "in any district *from,* through or into which" foreign commerce moves. 18 U.S.C. § 3237(a) (emphasis added). While Stock Clearing Corporation's office and building were at 44 Broad Street in Manhattan, and it had at least one vault there, we do not know in which of its ten vaults these certificates were stored, or where those vaults are, so that we cannot say for a certainty that the certificates were stolen from the Southern District. We may infer, however, that Seiller's office was in Manhattan from his letterhead containing a Grand Central Station box number and a Manhattan telephone number, and that the certificates were at some time in his possession there, since Seiller made the arrangements under which the securities were to be delivered. Furthermore, Seiller described the securities in a letter to Scholz on September 24 as

being "on hand," additional evidence for the inference they were at one time located in his Manhattan office. There was a sufficient basis for the finder of fact to conclude that the stolen certificates were at one point located in Manhattan and thus venue in the Southern District of New York was proper. *Cf.* United States v. DeKunchak, *supra,* 467 F.2d at 437. United States v. Bozza, 365 F.2d 206 (2d Cir. 1966), heavily relied on by appellant, is inapposite for, as stated in United States v. DeKunchak, *supra,* 467 F.2d at 438, *Bozza* interpreted only the first paragraph of 18 U.S.C. § 3237 and not the second paragraph which is at issue here.

## III. *Speedy Trial.*

■ Appellant Infanti's speedy trial argument in his brief is based upon the sixth amendment as interpreted in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), and upon Fed.R.Crim.P. 48(b). Since these two claims are substantially coterminous, United States v. Singleton, 460 F.2d 1148, 1152 (2d Cir. 1972), petition for cert. pending, No. 72–5068, both require a balancing of the length of the delay, the reason for it, the defendant's assertion of his right and the prejudice to the defendant. Barker v. Wingo, *supra,* 407 U.S. at 530, 92 S.Ct. 2182. This court has made a similar inquiry most recently in United States v. Counts, 471 F.2d 422 at 426–427 (2d Cir. 1973), United States v. Fasanaro, 471 F.2d 717, (2d Cir. 1973), and United States v. Saglimbene, 471 F.2d 16 (2d Cir. 1972). Here the length of time from arrest to indictment was 21 months and from arrest to trial 28 months, neither extraordinary. *See* United States v.· Saglimbene, *supra* (six years from indictment to trial held not undue). So far as appears the reason for the delay was neither negligence nor inefficiency on the part of the Government, much less a deliberate effort to delay the trial, *see* Barker v. Wingo, *supra,* 407 U.S. at 531, 92 S.Ct. 2182, but rather the somewhat complex nature of

the case and congested Southern District dockets. *Cf.* United States v. Stein, 456 F.2d 844, 848 (2d Cir.), cert. denied, 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972). Witnesses included not only a police inspector and a securities representative from Frankfurt but a hotel manager from London and a TWA passenger records chief and the evidence was largely circumstantial. Appellant Infanti was arrested on October 3, 1969, and indicted on June 23, 1971. He did not, however, assert his speedy trial claims until August of 1971 indicating that he did not view the 22-month delay between arrest and indictment as a terribly serious deprivation. Barker v. Wingo, *supra,* 407 U.S. at 531, 92 S.Ct. 2182. Apparently, however, he viewed the ten and one-half month delay between indictment and trial differently as he complained of it within a month and one-half.

Appellant claims prejudice in that one witness who could have testified that appellant scheduled a business trip to London in July or August, 1969, died, but this death occurred only nine months after appellant's arrest so that this witness would not have been available at trial even if it had taken place much sooner. One Sheldon Schwartz, to whom Kurtz placed a call in New Jersey from London, who is said to have been a "key witness for the defense," also died before trial but some time after arrest. Only in the brief on appeal, however, is it suggested that "[p]resumably he could have testified to the origin of the stock and appellants' lack of knowledge that they were stolen"; nowhere below was a similar claim made. We infer from a question put by Kurtz's lawyer to the United States Attorney who interrogated Kurtz after his arrest that Schwartz was in the "insurance and estate planning business" and conceivably was the individual who gave Infanti the securities on behalf of Seiller who, by his own statement, was unknown to Infanti (and presumably Kurtz). But there is no evidence in the record—neither Infanti nor Kurtz testified—to in-

dicate that Schwartz was in fact the go-between. The assertion of prejudice in this regard is not substantiated. *Cf.* United States v. Fasanaro, *supra,* 471 F.2d at 718. An examination of the entire record reveals that the lapses in a few prosecution witnesses' memories probably aided rather than hurt the defendants' case. *Cf.* United States v. Stein, *supra,* 456 F.2d at 849. Finally Infanti asserts prejudice from the destruction in the regular course of business of airline records which he claims would have shown tickets for the flight from Frankfurt to London. Since round trip tickets from New York to Frankfurt had been purchased, however, two days before the flight from Frankfurt to London, it is difficult to see what possible effect ticket records for the flight from Frankfurt to London would have. Nowhere is it claimed that reservations were made for the London trip in advance of the departure for Frankfurt; such a claim would hardly be credible in light of the direct round-trip ticket purchase in any event. Weighing all of the Barker v. Wingo factors we find neither a sixth amendment nor a Rule 48(b) violation.

■ Belatedly on oral argument and by post-argument letter to the court a claim is raised under the Second Circuit Rules Regarding the Prompt Disposition of Criminal Cases ("the Rules") and the point is made that the chronology in this case closely resembles that in United States v. Scafo, 470 F.2d 748, at 750–751 (2d Cir. 1972), where we remanded for further findings in respect to the motion under the Rule 5(h) exception. *See also* United States v. Valot, 473 F.2d 667 (2d Cir. 1973). Here, however, no motion under our Rules was made below. We see no reason to treat the motion grounded under the sixth amendment and Fed.R.Crim.P. 48(b) as one also under our Rules. The Rules are designed only to insure prosecutorial readiness for trial; the constitutional guarantee and Rule 48(b) protect against the loss of speedy trial rights from whatever cause. Here, the Government filed a no-

tice of readiness. There is every reason to believe both the Government counsel and the court below would have treated the motions to dismiss for failure to prosecute quite differently had they been grounded specifically on our Rules. Indeed, our Rules provide "failure of a defendant to move for discharge prior to plea of guilty or trial shall constitute waiver of . . . rights [under the Rules]." Rule 8.

Judgment affirmed as to Infanti; reversed as to Kurtz.