**UNITED STATES of America,**
**Appellee,**

v.

**Salvatore Thomas BADALAMENTE**
**and Herbert Yagid, Appellants.**

**Nos. 1186 to 1205, Dockets**
**74–1517, 74–1586.**

United States Court of Appeals,
Second Circuit.

Argued July 16, 1974.

Decided Nov. 21, 1974.

Certiorari Denied April 14, 1975.

See 95 S.Ct. 1565.

Michael C. Eberhardt, Sp. Atty., U. S. Dept. of Justice, Washington, D. C. (Paul J. Curran, U. S. Atty., S. Andrew Schaffer, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before WINTER * and MULLIGAN, Circuit Judges, and NEWMAN,** District Judge.

WINTER, Circuit Judge:

Salvatore Thomas Badalamente and Herbert Yagid, together with five others, including a certain Jerry Allen, were charged in a two-count indictment with conspiracy to transport in interstate and foreign commerce falsely-made, forged, altered and counterfeited passbooks and certificates of deposit obtained from various United States banks, in violation of 18 U.S.C. § 371, and with the substantive crime of interstate transportation of a falsely-made, forged, altered and counterfeited American Savings Association passbook and certificate of deposit, in violation of 18 U.S.C. §§ 2314 and 2. The essence of the government's case was that the various defendants conspired to obtain a false or forged savings bankbook, to transport it to Europe for use as collateral for a bank loan and to distribute the proceeds of the loan among themselves, and that the defendants carried out the conspiracy at least to the point of interstate transportation within the United States. Allen and two of the other co-defendants pleaded guilty. Prior to trial, the district court granted the government's motion to dismiss the substantive count against Badalamente. On the conspiracy count, Badalamente, and on the conspiracy and substantive counts, Yagid, and another co-defendant, Stern, were tried jointly before a jury. Allen testified as a government witness. All were found guilty on all charges. Badalamente and Yagid both appeal; Stern does not.

Badalamente advances several reasons for reversal of his conviction, viz., legally

Alfred Lawrence Toombs, New York City (Michael P. Direnzo, New York City, on the brief), for appellant Badalamente.

William Epstein, New York City (William J. Gallagher, The Legal Aid Society, New York City, on the brief), for appellant Yagid.

* Of the Fourth Circuit Court of Appeals, sitting by designation.

** Of the United States District Court for the District of Connecticut, sitting by designation.

insufficient evidence to convict him of conspiracy, denial of effective assistance of counsel, prejudicially restricted cross-examination by the district court, and erroneous instructions and omission of essential instructions. Persuaded that there were not reversible errors in Bada-lamente's trial, we affirm as to him.

Yagid also advances numerous contentions why his conviction should be reversed. One is that the government suppressed exculpatory material having substantial relevance to the credibility of Allen, one of the two principal government witnesses against Yagid. Others relate to the district court's rulings on evidence and the district court's instructions to the jury. We find merit in Yagid's first point, and therefore we reverse, as to him, and grant a new trial. Because it is possible that at the new trial the district judge who presided at the original trial may be required to testify concerning certain aspects of the suppression, we will not consider Yagid's other claims of reversible error. This is so because, on retrial, another district judge should preside and he will not be bound by the rulings of the original trial judge but rather will be free to make his rulings on evidence and on instructions on the record developed before him.

Yagid's appeal requires a more detailed discussion of the evidence than does that of his co-appellant. Because it will provide the context in which Badalamente's contentions are raised, we will discuss it first.

### No. 74–1586—Yagid's Appeal
#### I.

The government's case against Yagid rested principally on the testimony of Herbert Olsberg, a paid informer, and Allen, one of the co-defendants who pleaded guilty and testified as a government witness. Yagid sought to overcome its incriminating effect by testifying in his own behalf that Olsberg had entrapped him into joining the conspiracy but that, after becoming a member, he withdrew prior to the commission of the substantive offense. Olsberg, of course, denied entrapment, but the classic question of whom to believe was submitted to the jury.

Olsberg's testimony, succinctly stated, was that on March 6, 1973, Yagid, known to Olsberg as a result of legitimate prior business dealings, made inquiries of Olsberg about the possibilities of using a fictitious bank passbook as collateral for a loan. Olsberg said that he would have to see the passbook before he could say, and it was agreed that there would be another meeting. The initial inquiry was made in the presence of Stern. Before another meeting, Olsberg communicated with the F.B.I. and became a paid informer.

The next meeting occurred approximately March 9, 1973, at the Luxor Baths in New York City, where Yagid and Stern introduced Allen and a certain Berardelli, the purported holder of the passbook, to Olsberg. Again Olsberg was asked if the passbook could be used as collateral for a loan, and again Olsberg declined a definitive opinion until he could examine the passbook, although he did say that if the passbook was "good" he would probably take it to Switzerland. There was a discussion of the split of the proceeds if the transaction was effected, and Yagid and Stern said that they would have to discuss the split with their "partner who sits across the river."

There followed, over the period March 10, 1973 to April 2, 1973, a series of communications and meetings between the principals identified and others who were introduced into the conspiracy. Not only the split, but also many of the other details of the conspiracy were discussed and planned. Throughout, Olsberg was pressing to examine the passbook to be used as collateral. He and Yagid made an abortive trip to the west coast for that purpose. On March 23, 1973, Olsberg and Yagid had a meeting at Fort Lee, New Jersey, ostensibly to meet the "man who sits across the river" at Leo's restaurant. Badalamente was present, chastised a waiter who disclosed Badalamente's identity, and engaged in a discussion of the progress of planning

and how the proceeds of the "loan," when effected, would be distributed. Badalamente offered the comment that if the deal went through, "it would be a good deal for all of us."

Still the passbook had not been shown to Olsberg. Before it was, he was told that it would not be a passbook issued by a California savings and loan association as originally represented, but rather one from American Savings Association of Dallas, Texas. Olsberg and Yagid separately travelled to Chicago where Olsberg was to see the passbook, but on arrival Yagid advised Olsberg to leave Chicago immediately because law enforcement personnel were at the airport. Olsberg returned to New York without having made the examination.

Finally, on April 2, 1973, at a Holiday Inn, Olsberg was shown a passbook and certificate of deposit from American Savings Association. They were exhibited to him by a certain Leonard Turi who had purportedly flown to Newark for that purpose. The conspiracy was terminated then and there, because Turi was arrested by the F.B.I. Arrest of the other participants followed.

The witness Allen testified that Berardelli first suggested the passbook deal in the summer of 1972. Allen said that he did not hear of it again until January or February, 1973, when Berardelli revived the proposal. After the latter conversation with Berardelli, *Allen* had contact with Yagid and Stern about the possibility of effecting the loan through them. At their request, he arranged, but did not attend, a meeting between them and Berardelli at the Luxor Baths. Allen had another conversation with Yagid thereafter about Allen's inability to make the "loan," and in the second week of March, 1973, he met with Olsberg (to whom he was introduced for the first time), Berardelli, Yagid and Stern at the Luxor Baths, at which numerous aspects

of the transaction were discussed. He testified about his second attendance at a meeting with the same persons, again at the Luxor Baths, at which the expenses and payoff of the deal were discussed.

It is manifest from this summary of Allen's testimony that if he was believed as a witness, Yagid's defense of entrapment by Olsberg would be demolished even if Yagid's testimony was believed, because Allen corroborated Olsberg's denial of entrapment in all essential respects. According to Allen, the concept of the conspiracy originated with Berardelli and not Olsberg, it was Allen who made the first approach to Yagid and not Olsberg, and Yagid evidenced a willingness to participate even before Olsberg was introduced as a co-conspirator. The importance of Allen's testimony is made greater by the fact that Olsberg, as a paid informer, was not the most credible witness in disputed, uncorroborated aspects of his testimony.

We turn now to the factual aspects of the claim of suppression. They arise from the filing, after the trial and as part of the record on appeal, of certain letters passing between Allen, the trial judge and the United States attorney, and the investigations of counsel when the letters were discovered. The facts are not in dispute, only their legal consequence and the corrective action which is indicated. Prior to trial, the government, pursuant to the request of Yagid and others, agreed to furnish all Jencks Act material, 18 U.S.C. § 3500, by the time required by the Act, if not earlier; and the government acknowledged its duty to reveal exculpatory evidence in its possession.

On October 25, 1973, the district judge received a letter from Allen claiming, in extravagant terms, harassment by the United States Attorney's Office. The text of the letter is set forth in the margin.[1] On November 5, the district

1.                    October 25, 1973
                     Le "Beau Rivage"
                     Lausanne-Ouchy
Judge Carter—
   I have written a letter to Judge Gerfein [sic]—*please your honor, forgive my violat-*

*ing protocol*—but I have been terrorized by an Assistant U.S. Attorney named Ira Sorkin—and his sidekick, Tom Doonan, I stand indicted by Mr. Eberhardt on a case that will be heard before your Court—*Mr. Eberhardt has acted in a proper way*—

judge wrote to the United States attorney, sending him a xerox copy of Allen's letter and stating that while the judge found it difficult to give credence to the assertions of the letter, the possibility that they may be true could not be dismissed out of hand. He therefore said that he was requesting the United States attorney to investigate the matter; and since it was one concerning the integrity of the latter's office, he would require the United States attorney's personal attention and personal assurances as to the results of the investigation. On the same day, the district judge wrote to Mr. Allen and advised him the United States attorney had been requested to look into the matter of Allen's complaints.

Apparently the United States attorney did not respond to the district judge within a reasonable period, because the judge wrote to him again on January 10, 1974, mildly criticizing him for failure even to acknowledge the original letter, and renewing his earlier request for a personal investigation and a personal report. Counsel claim that their investigation, when they discovered the fact of the letters after trial, shows that the United States attorney visited the district judge about the matter *in camera* on or about January 10, 1974, and thereafter the district judge took no further steps nor did the United States attorney—not even to inform counsel about what had transpired. It was apparently at the instance of the district judge that the letters were forwarded to the clerk of the district court and included as part of the record in this appeal.

Counsel for Yagid also claim that, as a result of their investigation, they found six more letters written by Allen to various officials, all of which were in the possession of the prosecutors at the time of trial. The prosecutors do not dispute this. The letters allege a long, forceful attempt by two assistant United States attorneys to force Allen to become a government witness.

Notwithstanding the government's agreement for their production, under 18 U.S.C. § 3500, none of the letters was produced for inspection by Yagid's attorney before or during the cross-examination of Allen. In fact the letters were not known to Yagid's counsel until after the conclusion of the trial.

## II.

We can only read the letter which we have quoted, and those which we have not set forth but which have an even more hysterical tenor, as suggesting, as Yagid's counsel so aptly characterizes, "that Allen was either under extreme pressure from the United States Attorney's office to testify, whether truthfully or not, or that he was either a liar or deranged." All of these, or various combinations, are possibilities. Significantly, any one would have a powerful adverse effect on Allen's credibility; and, as we have shown, his credibility may well have been the determinative factor in the minds of the jury when it disbelieved Yagid's defense and found him guilty.

■ We have no doubt that the letter to the trial judge and the letters to other

But Mr. Sorkin has insisted, using words and methods beyond rational belief—*that I tape and entrap* a number of prominent people—"*or he will crucify me*"—tapes made without court authorization—

Unless I become his professional informer—Mr. Sorkin warned me—he would continue naming me in what he referred to as his "frivolous" indictments—

He has badgered my family—my friends—*has insisted seeing me without a lawyer*—on many—many occasions—

When I finally exploded and told him that I would write to the court he said—"*Don't bother—it won't help*"

Respectfully,
JERRY ALLEN

P.S. Among those he wanted me to tape were Senator Javits—and Senator Harrison Williams—

He also insisted—in a rage—*that I tape conversations with my own lawyer Marty Frank*—(Mu 7–8930)

I will stand before you, Your Honor, and swear as to the above statements—

I realize the unorthodoxy of writing directly to you—but I am at the breaking point—so much so, that I'm almost afraid to come home—

Again, my apologies
Jerry Allen

(Emphasis in original.)

government officials were Jencks Act material, that they had a direct bearing on the persuasiveness of Allen's testimony, and that their nonproduction was reversible error warranting the reversal of Yagid's conviction and the award of a new trial. United States v. Sperling, 506 F.2d 1323 (2 Cir., 1974); United States v. Pacelli, 491 F.2d 1108, 1119 (2 Cir. 1973); [2] United States v. Pfingst, 477 F.2d 177, 194–195 (2 Cir. 1973); United States v. Polisi, 416 F.2d 573, 577–579 (2 Cir. 1969). See also United States v. Mayersohn, 452 F.2d 521 (2 Cir. 1971). Although the prejudicial failure to produce the material in accordance with 18 U.S.C. § 3500 is enough to require reversal and a new trial, we think that as the trial continued after Yagid testified—where his testimony made the credibility of Allen crucial to the determination of Yagid's guilt or innocence—the nonproduction of the Allen letter to the trial judge and the Allen letters to other public officials was a violation of the rule in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

■ The only problem that denial of Yagid's Jencks Act rights—and, indeed, his constitutional rights—presents is the

relief to be afforded him at the appellate stage of the proceedings. In its brief, the government urged that, at most, the case should be remanded to the district court for initial consideration of the issues surrounding the writing of the Allen letters, their nondisclosure and importance. Although in oral argument the government receded somewhat from that position, we see no reason for a remand and no reason why Yagid should not receive definitive relief from us. There is no dispute that the letters were in the possession of the prosecution during the trial, the government had bound itself to produce Jencks Act material and to comply with the *Brady* rule, the significance of the letters was evident on their face, and their importance as tools for impeachment of a crucial witness was inescapable. Accordingly, we perceive no useful purpose to be served by a remand. We reverse Yagid's conviction and grant a new trial.

*No. 74–1517—Badalamente's Appeal*

I.

■ The ground for reversing Yagid's conviction is inapplicable to Badalamente, because the record reflects the accuracy of his brief that Allen's testimony merely "confirmed the existence of the conspiracy and the participation of Yagid and Stern, but did not implicate Badalamente in any manner."[3] We pro-

2. United States v. Sperling and United States v. Pacelli are of special interest because both involved the nonproduction of letters, in the possession of the prosecutor, written to public officials by significant government witnesses. Both cases hold the nonproduction a violation of 18 U.S.C. § 3500. In *Pacelli*, the conviction of the single appellant was reversed and a new trial awarded. In *Sperling*, upon an analysis of the prejudicial effect of nonproduction in the light of the other evidence in the case, the convictions of some appellants were reversed while others were affirmed on the harmless error doctrine. In the instant case, we think, as developed in the text, that reversal is ineluctable. The stand-off between the testimony of Olsberg, an impeachable witness, and Yagid, also impeachable, may well have been resolved only by the testimony of Allen whose credibil-

ity may have been subject to further serious attack.

3. While Allen's testimony did confirm the existence of the conspiracy, the fact that a conspiracy existed was not a question about which there was any real dispute at the trial. The jury was told that Yagid, Badalamente and Stern were charged with conspiring with each other and four other named individuals, including Allen who testified at trial and admitted his guilt. In fact, Turi, Berardelli and Allen, three of the named co-conspirators, pleaded guilty before the trial of Yagid and Badalamente began. The testimony of Olsberg and others, excluding Allen, showed the existence of a conspiracy among all of the named co-conspirators. Indeed, Badalamente in his brief states that "the evidence abundantly demonstrated the existence of the con-

ceed therefore to Badalamente's first contention that the evidence against him was legally insufficient to support the guilty verdict on the charge of conspiracy.

Badalamente does not question that there was ample proof to show that he acted in concert with his co-defendants in a plan to obtain a loan from a Swiss bank using the passbook of a California savings and loan institution as collateral. His claim is that there was a failure of proof legally sufficient to show that he was aware of the illegal character of the plan, i. e., principally, that the passbook was forged, and secondarily, that the loan was not a legitimate one intended to be repaid but rather that it was a guise for defrauding the lending bank. We cannot agree that, taken in the light most favorable to the government, there was lacking proof from which the jury could infer, beyond a reasonable doubt, Badalamente's knowledge of the contested elements of the conspiracy.

Olsberg testified that at the March 23, 1973 meeting at Leo's restaurant at Fort Lee, New Jersey, Badalamente was the person with whom he and Yagid met, and thus that Badalamente was the "man across the river" who was at least one of the directors of the scheme and who could be expected to know its intimate details. Olsberg also detailed the conversation which then occurred, most of which could serve as the basis for the inference that Badalamente was very much a part of the inside group and lacking in essential knowledge. Olsberg made no claim that he or Yagid told Badalamente that the passbook which would be used was to be forged. On the other hand, a number of the aspects of the transaction discussed in Badalamente's presence provided a further basis from which the jury could have inferred that Badalamente quite reasonably knew that the passbook would be forged and that the proposed loan was not a legitimate transaction.

First, Olsberg said that Badalamente asked him whether he thought the passbook deal was good and if in fact he (Olsberg) could do it. Olsberg said that his reply was that he would have to see the passbook. This response, we think, is quite inconsistent with a proposal for a legitimate loan secured by the pledge of a valid passbook. Only if the passbook were not legitimate would it be important for Olsberg to examine it to determine whether it would withstand the scrutiny of Swiss bankers. The jury could have inferred that Badalamente knew as much.

Second, the method by which the proceeds of the loan were to be brought to New York was thoroughly discussed and the discussion may properly have been considered to give rise to the reasonable suspicion on the part of Badalamente that the transaction was not legitimate. Badalamente contends that these surreptitious arrangements were consistent with an attempt to circumvent export restrictions or avoid taxes, but this was a matter of defense or interpretation which the jury could or could not believe. Certainly if such an explanation was not believed, the discussion of the proposed physical transfer of the money and distribution of it among various participants in the transaction provided an ample basis for the conclusion that the loan was not a legitimate transaction.

Finally, Olsberg testified that Badalamente stated that the "splitting" of the funds would have to be settled afterwards, because the expenses would have to come off the top. Such a statement

---

spiracy and the guilt of Yagid, Stern, Allen, Berardelli and Turi."

At trial, the dispute as to Yagid was whether he had been entrapped by Olsberg into joining the conspiracy and, if so, whether, after becoming a member, he had withdrawn prior to the commission of the substantive crime. At trial, the dispute as to Badalamente was whether he had joined the conspiracy with knowledge of its illegal ob-

jectives rather than simply participated with Yagid, Stern and Olsberg in a perfectly legal real estate transaction as he claimed.

Since we are persuaded that there was no real possibility that the jury convicted Badalamente solely upon the finding that he conspired with Yagid alone, we conclude that the defect in Yagid's conviction does not require that Badalamente be given a new trial.

could well be considered by the jury as inconsistent with an understanding on Badalamente's part that the transaction was a legitimate one. The jury may well have inferred that Badalamente was speaking of a transaction which would yield a profit to be divided among the participants when the funds were received rather than a transaction in which an obligation to repay was being voluntarily assumed. In sum, we think that a jury had a basis on which to infer beyond a reasonable doubt that Badalamente knew that the deal in which he was participating was not a legitimate attempt to obtain a loan, but rather an attempt to defraud a Swiss bank by providing a forged passbook as collateral for a loan.

United States v. Infanti, 474 F.2d 522 (2 Cir. 1973), is not contrary to our conclusion, as claimed by Badalamente. There, a certain Kurtz was convicted not of conspiracy, but of the substantive offense of transporting stolen securities in interstate or foreign commerce. The conviction against him was reversed for lack of legally sufficient evidence to show that Kurtz knew that the securities were stolen. The only evidence in this regard was that Kurtz and a certain Infanti flew from New York to Frankfurt, Germany, where they met in a hotel room with certain persons interested in purchasing stock certificates, subsequently shown to have been stolen, that Infanti had in his possession. There was no evidence that Kurtz had actual or constructive possession of the certificate so that no presumption of knowledge from possession of stolen property was created. The only evidence of Kurtz's knowledge was that at one point during the negotiations the prospective buyers started to record the identification numbers on the stock certificates. When Infanti saw this, he retrieved the certificates and said that he could not let their numbers be recorded before he obtained permission so to do from his principals. The government claimed that this should have given Kurtz knowledge that the certificates were stolen because he should have known that any listing of the certificate numbers could be compared with the New York stock exchange's publication of the certificate numbers of stolen certificates.

In Badalamente's case, we think there was more and stronger evidence from which it could be inferred that the passbook was stolen than the evidence that the stock certificates were stolen in Kurtz's case. Moreover, in *Infanti*, Kurtz was prosecuted for the substantive crime, and the question was whether Kurtz knew that the certificates were stolen at the time he participated in the foreign transportation. Even if Kurtz gained knowledge in the hotel room, the transportation to Frankfurt had already occurred and there was no proof of subsequent transportation in foreign commerce. Thus, there was lacking proof of an essential element of the crime. By contrast, Badalamente was prosecuted for a conspiracy, and the continuing character of the conspiracy offense obviates the need to have the guilty knowledge contemporaneously with some other event so long as that knowledge is obtained during the life of the conspiracy. As we hold, the fact of such knowledge could properly have been inferred from the evidence concerning the March 23, 1973 meeting.

## II.

Badalamente's claim that he was denied effective assistance of counsel has several aspects. He claims that there was a conflict of interest between his trial attorney, Salvatore Nigrone, and Paul P. Rao, trial attorney for Yagid and Stern; that his trial attorney was improperly permitted to represent his codefendant Turi, who pleaded guilty prior to trial, again creating a conflict of interest; and that his attorney was incompetent. We are not persuaded.

█ The claim of conflict of interest between Nigrone and Rao rests on the factual basis that both filed pleadings showing the same office address, 233 Broadway, New York City; that in pretrial proceedings Nigrone twice referred to Rao as his associate; and that in a

pretrial pleading the government referred to them as partners. The record does not disclose the basis of the government's assertion, and since it was made in the context of the government's opposition to furnishing Yagid and Stern copies of other defendants' statements possessed by the government, we think it of little weight. The record does not show that Nigrone and Rao were partners and that their interests overlapped in the acceptance of clients or sharing of fees. At most it shows that they worked in close physical proximity, that they shared an office and perhaps a secretary. We think this an insufficient basis on which to erect a claim of conflict of interest.

■ Nigrone did represent Turi as well as Badalamente, but we fail to see how, when Turi pleaded guilty and did not testify, a conflict of interest arose or how Badalamente suffered prejudice, even though Turi's sentencing was postponed until after Badalamente's trial. Cf. United States v. Lovano, 420 F.2d 769 (2 Cir. 1970). Our previous decisions concerning conflicts of interest have all arisen in the context of an attorney representing two or more defendants who pleaded not guilty and went to trial. More importantly, we see no merit in the argument that there was a likelihood that Turi was not called as a defense witness so as not to jeopardize his favorable treatment at sentencing. It is not likely that a truthful witness exonerating Badalamente would be penalized for his effort. It is more likely, we think, that Turi did not testify to spare Badalamente the damaging adverse testimony of a co-conspirator.

■ Badalamente asserts incompetence on the part of his trial attorney in three respects: (1) his counsel did not object to several continuances of the trial, requested by other counsel, and in the interim a "potential" witness—one who had been present at the March 23 meeting—died; (2) his counsel did not press the government for noncompliance with an order of court requiring the production of psychiatric and court records of Olsberg which would have been of value in cross-examination of Olsberg; and (3) his counsel, who was discharged shortly after the trial, failed to move for a new trial or to obtain an extension of time for such a motion so that when successor counsel filed the motion it was ruled untimely.

The rule by which these instances of alleged incompetence is to be measured is that "lack of effective assistance of counsel must be of such a kind as to shock the conscience of the Court and make the proceedings a farce and mockery of justice." United States v. Wight, 176 F.2d 376, 379 (2 Cir. 1949), cert. den., 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950). See also United States ex rel. Walker v. Henderson, 492 F.2d 1311 (2 Cir. 1974); United States v. Sanchez, 483 F.2d 1052 (2d Cir. 1973). Neither singly nor collectively do Badalamente's instances satisfy the tests. Failure to object to continuances is an accepted strategy for the guilty defendant who wishes to postpone the day of reckoning. The record shows an adequate cross-examination of Olsberg and a substantial effort to impeach him. Badalamente's trial attorney had moved unsuccessfully for a directed verdict at the close of the government's case and at the close of the entire case. It is unlikely that any motion for a new trial would have been worthy of more than cursory consideration.

### III.

■ The contention that cross-examination was prejudicially restricted arises from the ruling of the district court sustaining the government's objection to Badalamente's attorney's question to Yagid, ". . . was Sam Badalamente your *partner* in the bank book deal?" (emphasis added). The district court assigned no reason for its ruling. Strictly read, the question could be deemed objectionable for seeking to elicit a legal conclusion. To that extent, we do not think that the district court abused its discretion in sustaining the objection.

At the same time we recognize that the word "partner" has factual connotations and is used in colloquial conversation. If construed to elicit a factual response, the question was a proper one; but any error in sustaining the objection was, however, harmless since the ruling did not preclude further development of the factual relationship between Yagid and Badalamente. That Badalamente's counsel did not choose to rephrase the question and abandoned the line of questioning does not alter this conclusion.

■ Nor do we think that there were errors or omissions in the instructions. Badalamente's contention is that the charge failed to elaborate on his defense of noninvolvement and to distinguish it from the entrapment and withdrawal defense raised by Yagid and also by Stern.

The district court's instructions made plain to the jury that it should consider each count of the indictment separately and consider whether the government had proved its case beyond a reasonable doubt as to each defendant in each count. While the district court did not remind the jury that Badalamente maintained that he did not participate in the conspiracy. Badalamente made that argument to the jury. The district court did tell the jury that only Yagid and Stern asserted the defense of entrapment and withdrawal, and in discussing that defense the district court referred to Yagid and Stern several times by name and not to Badalamente. Thus, we have no doubt that there was no confusion in the minds of the jury that only Yagid and Stern were claiming entrapment and that Badalamente was not. The general instructions about a defendant's presumption of innocence, the quantum of proof needed to overcome it, and the instruction that the government's case against each defendant on each count must be separately considered, we think was sufficient fairly to present to the jury Badalamente's defense of no involvement.

No. 74–1517—Affirmed.

No. 74–1586—Reversed; new trial awarded.