**UNITED STATES of America,
Appellant,**

v.

**Herbert YAGID, Defendant-Appellee.**

**No. 265, Docket 75–1288.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 29, 1975.

Decided Jan. 5, 1976.

Michael C. Eberhardt, Sp. Atty. for the U. S. Dept. of Justice (Paul J. Curran, U. S. Atty., S. D. N. Y., John D. Gordan, III, Asst. U. S. Atty., of counsel), for appellant.

Herbert Yagid, pro se.

Before MULLIGAN, OAKES and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

On July 7, 1975 the District Court for the Southern District of New York dismissed Indictment 73 Cr. 471 against Herbert Yagid on the ground that he had not been retried, after a successful appeal, within the 90 day period prescribed by Rule 6 of the Southern District's Plan for Achieving Prompt Disposition of Criminal Cases ("the Plan"). The government appeals that dismissal. It claims that the district court should not have dismissed the indictment because, at the time of the order of dismissal, the 90 day period had not yet expired. Rule 6 reads as follows:

"Where a new trial has been ordered by the district court or a trial or new trial has been ordered by an appellate court, it shall commence at the earliest practicable time, but in any event not later than 90 days after the finality of such order unless extended for good cause."

The government contends that this Court's order for a new trial did not become final on December 16, 1974, when its mandate was filed, but rather on April 14, 1975, when the Supreme Court denied Yagid's co-defendant's petition for writ of certiorari. The government argues further that even if the earlier date applies, good cause existed for the extension of the 90 day period. In short, it claims that Rule 6 had not been violated and that, consequently, Judge Brieant's dismissal of the indictment should be reversed.

A brief discussion of the facts is necessary to understand the government's argument as well as our reasons for affirming the order of the district court.

Herbert Yagid, Jerry Allen, Salvatore Badalamente, Louis Stern and three others originally were charged in a two-count indictment with conspiracy to transport in interstate and foreign commerce forged, altered and counterfeit passbooks and certificates of deposit obtained from various banks in violation of 18 U.S.C. § 371, and with the substantive crime of interstate transportation of such passbooks and certificates of deposit in violation of 18 U.S.C. §§ 2314 and 2. Allen and two other co-defendants pleaded guilty. The substantive count was dismissed as to Badalamente, but he was tried before a jury on the conspiracy count along with Yagid and Stern, who were also tried on the substantive count. Allen testified as a government witness and all were found guilty on all charges. Yagid and Badalamente appealed, advancing numerous contentions why their convictions should be reversed. This Court concluded that the government's suppression of material having substan-

tial relevance to Allen's credibility required a new trial for Yagid. Because Allen's testimony did not implicate Badalamente in any manner, however, Badalamente could not win a new trial on this ground. *United States v. Badalamente,* 507 F.2d 12, 18 (2 Cir. 1974), *cert. denied,* 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975). In the opinion on that appeal, this Court observed that another district judge should preside at the new trial since Judge Carter, the presiding judge in the first trial, might be required to testify about certain aspects of the suppression. 507 F.2d at 15.

Our mandate, dated December 12, 1974, was filed in the district court on December 16, 1974. Badalamente petitioned for a writ of certiorari in the Supreme Court on January 17, 1975, 43 U.S.L.W. 3529. Certiorari was denied on April 14, 1975, 421 U.S. 911, 95 S.Ct. 1565, 43 L.Ed.2d 776 (1975). Apparently, no one connected with Yagid's case made any efforts to have it assigned for retrial until late February, 1975, when the Assistant United States Attorney addressed telephone inquiries to Judge Carter's chambers about reassignment, only to be told that the matter "would be taken care of." Someone at the District Court Clerk's office erroneously told both parties that the case had been reassigned to Judge Harold Tyler. After phone calls to Judge Tyler's chambers failed to clarify matters, the government again was informed by the Clerk's office that the case had been placed on Judge Tyler's docket. In mid-March, the government learned that all of Judge Tyler's cases were in the process of being reassigned.[1] Unfortunately, at no time did the government seek to communicate in writing with Judge Carter, who had tried the case on its first journey through the judicial system.

In mid-April, the government filed a Notice of Readiness in an attempt to ascertain the whereabouts of the case. After learning that the notice had not been docketed, the government, on April 30, 1975, filed a new Notice of Readiness.[2] In response thereto, Judge Carter, on May 23, 1975, sent a memorandum to the District Court Assignment Committee which said:

"I have just received a notice of readiness for trial on or after May 5 [1975] in the above case. . . . [T]he opinion of the Court of Appeals suggests that I not preside at the retrial. Apparently this development had not come to the attention of the Assignment Committee, and the case has not yet been reassigned. I would suggest that the reassignment proceed without delay, and that the Judge who is to preside over the trial be advised that he may have to proceed with the trial of this case promptly."

By June 4, 1975 the Assignment Committee had reassigned the case to Judge Brieant. Judge Brieant held a pretrial conference on June 20, 1975 where he raised the issue of compliance with Rule 6. He heard oral argument on the point on July 2, 1975 and, on July 7, 1975, filed a memorandum opinion and order dismissing the indictment against Yagid without prejudice because the government had failed to commence the retrial of the case within 90 days, as required by Rule 6 of the Plan.

The memorandum opinion intimated that this Court is without power to effect changes in the district court's docket and that "[a]ccordingly, notwithstanding a recommendation of the Court of Appeals that a case 'should' be reassigned to another judge, no reassignment should be expected to take place except upon the initiation of the attorney for the Government or defendant, or on the application of the Assigned Judge himself." Before addressing the issues raised on appeal, we should place in focus this

---

1. Judge Tyler had been appointed Deputy Attorney General of the United States. He assumed his new duties on April 7, 1975.

2. Since a Notice of Readiness is inapplicable to retrial of a case, the government acknowledged that its only purpose in filing was to clear up the confusion surrounding assignment.

Court's recommendation that a different judge should preside over the new trial and the communication of that observation to the court below.

 The district court's apprehension that this Court is injecting itself into the assignment process of the district courts is unwarranted. We did not suggest who *should* preside over the retrial. We suggested who *should not* preside.[3] When we believe that there is an inherent problem in a particular remand, we have the power, indeed the duty, to frame our opinion to provide for "further proceedings . . . [which are] just under the circumstances." 28 U.S.C. § 2106.[4] The fact that Judge Carter might be called as a witness at retrial warrants assigning the retrial to a different judge. Such suggestions contained in appellate opinions should not be deemed merely precatory because they are not "ordered," especially when a retrial is mandated.[5] Rule 41(a) of the Federal Rules of Appellate Procedure specifically provides that "[a] certified copy of the judgment and a copy of the opinion of the court . . . shall constitute the mandate . . . ."[6] We

emphatically reject the district court's notion that "[s]uch a provision in an appellate opinion . . . does not, *nor should it,* effect, without more, an automatic reassignment of the case." [emphasis added] We now turn to the issues raised on appeal.

## I. Finality of the Order for Retrial

The government cites *United States v. Roemer,* 514 F.2d 1377 (2 Cir. 1975), as authority for its position that the court's order for a new trial became final, not on December 16, 1974, when the mandate was filed, but on April 14, 1975, when Badalamente's petition for certiorari was denied. We find *Roemer* to be distinguishable from the facts of this case and affirm the dismissal of the indictment.

A superficial reading of *Roemer* might lead to the conclusion that it should be controlling in the instant case. Closer scrutiny, however, leads us to hold otherwise. *Roemer* was found guilty as a party to a conspiracy to defraud the United States.[7] The challenge to his conviction included a claim that his trial had not begun within the time limit es-

---

**3.** 28 U.S.C. § 137, cited by Judge Brieant to support his viewpoint, merely provides for the division of business among district judges. The statute has no relevance to an instruction from the Court of Appeals that another judge should preside over retrial.

**4.** 28 U.S.C. § 2106 in pertinent part provides:

"The Supreme Court or any other court of appellate jurisdiction may . . . remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances."

**5.** See, *United States v. Clark,* 475 F.2d 240, 251 (2 Cir. 1973), where this Court "advised" a hearing before a new judge because of the trial judge's prior decision regarding suppression issues. *See also, United States v. Rosner,* 485 F.2d 1213, 1231 (2 Cir. 1973), *cert. denied,* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 692 (1974); *United States v. Bryan,* 393 F.2d 90 (2 Cir. 1968).

**6.** See *Nixon v. Richey,* 513 F.2d 430, 435–437 (D.C.Cir. 1975).

**7.** The Rule 6 aspect of the *Roemer* decision evolved somewhat differently from the situa-

tion in the instant case. In *Roemer,* the government had delayed prosecution of the indictments while it attempted to secure one defendant's extradition from Europe. The district judge to whom the case had been assigned, upon motion by various defendants, dismissed the indictments because the government was not ready for trial within the period specified by the rules then in effect (Rule 4 of the Second Circuit Plan). The Court of Appeals, finding excusable delay, ordered reinstatement of the indictments. This is an order for trial by the Court of Appeals which normally would trigger Rule 6. However, Roemer's co-defendants' sought reversal of this appellate decision by petitioning for certiorari. The district court delayed Roemer's trial until disposition of the petition for certiorari. Because of administrative mishaps, more than ninety days elapsed from the date of the Supreme Court's denial of certiorari until Roemer's trial began. Prior to trial Roemer moved to dismiss the indictment because of an alleged Rule 6 violation; after that motion was denied, the trial proceeded and Roemer was convicted.

tablished by Rule 6 of the Plan. In affirming the judgment of conviction, this Court held that the time limit for Roemer's trial did not begin to run until his co-defendants' petition for certiorari had been denied. The court found that even though Roemer had not petitioned for certiorari, he "plainly stood to benefit from his co-appellees' efforts in this regard. The order directing a trial for Roemer did not therefore become final until his co-appellees' attempt to overturn . . . [the appellate decision] came to rest with the Supreme Court's denial of certiorari." 514 F.2d at 1381 n. 4.

The posture of the instant case is significantly different. What Badalamente, Yagid's co-defendant, sought by petitioning for certiorari was principally the *new trial already granted* Yagid. The government contends, however, that in a supplemental brief which Badalamente filed with the Supreme Court, he sought review on the basis of a new ground, which, if successful, would have benefitted Yagid by *dismissal* of the indictment.[8] That is true. Nevertheless, the instant case is clearly distinguishable from *Roemer.* Roemer did not prevail when the government appealed the dismissal of his indictment. The Court of Appeals ordered his indictment reinstated. His co-defendants sought certiorari on the very issue on which Roemer lost. Had they prevailed in the Supreme Court, Roemer clearly would have benefitted. Therefore, this Court properly found that the order for Roemer's trial did not become final until his co-defend-

ants' petition for certiorari was denied. In addition, by delaying Roemer's trial until the Supreme Court's disposition of the petition for certiorari, the criminal justice system also benefitted, since a needless trial might have been avoided. In the instant case, Yagid succeeded in winning a new trial. Badalamente, his co-defendant, did not. Badalamente sought certiorari for the very relief which Yagid had already won, plus dismissal of the indictment on an additional ground, which, if successful, would have benefitted many people under indictment, including Yagid.

In determining the proper limits of the "benefit" test of *Roemer,* we must consider the purpose of the speedy trial rules adopted by the district court pursuant to Rule 50(b) F.R.Cr.P.[9] The purpose of all the Plans for Achieving Prompt Disposition of Criminal Cases has been to serve the public interest in the prompt adjudication of criminal cases, and not "primarily to safeguard defendants' rights." *United States v. Flores,* 501 F.2d 1356, 1360 n. 4 (2 Cir. 1974). Neither purpose would be served, however, by following *Roemer* in the instant case. To expand *Roemer* beyond its factual setting, as the government urges here, could mean that in this Circuit a defendant, by asserting spurious claims in a petition for certiorari seeking greater relief than his co-defendant has sought and won, could bind his co-defendant insofar as a speedy trial is concerned. That result would neither serve the public interest in the prompt adjudication of criminal cases nor an accused's

---

8. The new ground was based upon an opinion of the district court, dated February 13, 1975, in *United States v. Crispino,* 392 F.Supp. 764 (S.D.N.Y.1975), in which that court held that where the commission letter authorizing a special "Strike Force" attorney to appear before the grand jury did not describe the type of cases to be investigated, the appearance of that attorney before the grand jury was unauthorized, and that indictments issued by that grand jury must be dismissed. This Court summarily reversed *Crispino,* 517 F.2d 1395 (2 Cir. 1975), the same issue having been decided in favor of the government in *In re Persico,* 522 F.2d 41 (2 Cir. 1975).

9. From 1971 through 1973, the Second Circuit promulgated Rules Regarding the Prompt Disposition of Criminal Cases. Rule 50(b), F.R. Cr.P. was then amended to require the district courts to adopt such plans, subject to the approval of the Judicial Council of the Circuit. The instant case falls within this set of rules adopted by the Southern District of New York. Finally, Congress enacted a new Speedy Trial Act in 1975, 18 U.S.C. § 3161 *et seq.,* which also contains a retrial provision, but which is not effective even in part until July 1, 1976.

interest in a speedy trial. Therefore, we decline the invitation to expand *Roemer* further.

## II. "Good Cause" Extension of the 90 day Period

■ Finally, we address the government's claim that "good cause" existed to extend the 90 day period. It argues that such "good cause" existed because it had made diligent efforts to bring the case to trial, because Yagid had done nothing to hasten the setting of a new trial date, and because this Court's clarification of Rule 6 in *United States v. Drummond,* 511 F.2d 1049 (2 Cir. 1975), had been issued two months after a new trial was ordered in the present case. We find these contentions to be without merit. While there may have been no prosecutorial misconduct here, certainly none of the administrative snafus in this case can be charged to the defendant. The issuance of our *Drummond* opinion still allowed the government one month to begin trial under the 90 day rule. In both *Drummond, supra,* 511 F.2d at 1054, and *Roemer, supra,* 514 F.2d at 1382, we found "good cause" for extending the 90 day period but warned that such delays in the future would not be tolerated. That future has arrived. We hold that there was no good cause for extending the time.

■ Rule 6 does not specify the sanction to be applied in cases of non-compliance. Because we recognize that the public has a dual interest of enforcing the criminal laws and of upholding the Plan, *United States v. Flores, supra,* 501

F.2d at 1360 n. 4, we believe that the trial court has discretion to decide whether dismissal should be with or without prejudice.[10] A "without prejudice" disposition is not an abuse of discretion absent a clear showing of prosecutorial misconduct, inordinate delay causing actual prejudice to the defendant, or other circumstances weighing heavily against reindictment. Since there has been no such showing made in this case, Judge Brieant properly dismissed the indictment without prejudice.

Affirmed.

MULLIGAN, Circuit Judge (dissenting):

I think that *United States v. Roemer,* 514 F.2d 1377 (2d Cir. 1975) is controlling here. In that case we held that the order directing a trial for Roemer did not become final even though he did not pursue possible appellate reversal because his co-appellees had sought certiorari and he "stood to benefit" from their efforts. 514 F.2d at 1381 n. 4. Here Yagid clearly would be benefited if his co-defendant had succeeded in persuading the Supreme Court to dismiss the indictment. He would not have to stand trial at all—the benefit here obviously would be greater than the new trial sought in *Roemer.* How then does the majority distinguish *Roemer?* We are told that the criminal justice system was benefited since a needless trial might have been avoided in that case. Had Badalamente succeeded in the Supreme Court in dismissing the indictment, Yagid's retrial would have become perforce

---

**10.** Originally, the defendant-appellee had cross-appealed, claiming that the order of dismissal should have been "with prejudice." This Court, before oral argument, granted his motion to withdraw this cross-appeal. There is precedent in this Circuit that dismissal for failure to comply with the Speedy Trial rules should be with prejudice. See *Hilbert v. Dooling,* 476 F.2d 355 (2 Cir.) *(en banc), cert. denied,* 414 U.S. 878 (1973); *United States v. Flores,* 501 F.2d 1356 (2 Cir. 1974). These cases, however, dealt with trial readiness requirements, rather than retrials after appeals. Also, *Hilbert* involved Rule 4 of the Second Circuit Rules which were in effect from 1971

to 1973 and have now been superseded by district court rules adopted pursuant to Rule 50(b) F.R.Cr.P. The Court there focused on the overall structure of the Rules, which delineated a "gamut of exceptions" to a dismissal with prejudice, and the specific language of Rule 4, which contained verbal imperatives and dismissal of the "charge" rather than the indictment. 476 F.2d at 358. Rule 4 of the District Court Plan, at issue in *Flores,* specifically mandated dismissal with prejudice unless the government's neglect was excusable. Thus, neither case controls the issue of the range of sanctions provided by Rule 6 of the District Court Plan.

unnecessary. The fact that many other defendants would have also benefited does not change the *ratio decidendi* of *Roemer*. Badalamente was a co-defendant in Yagid's trial and hardly an accidental or peripheral beneficiary.

We are also told by the majority that to expand *Roemer* would not serve the public interest in the prompt adjudication of criminal cases nor the accused's interest in a speedy trial. But Judge Smith pointed out in *Roemer*, 514 F.2d at 1381, that the public also has a concomitant interest "in the punishment and deterrence of criminal behavior." Moreover, since the dismissal below was without prejudice and Yagid can be reindicted, the question of "speed" is not now an issue. The trial court here also found that Yagid himself in any event had not made any effort to bring the case to trial.

The majority finally warns that to extend *Roemer* could mean that a defendant, by asserting "spurious" claims "in a petition for certiorari seeking greater relief than his co-defendant has sought and won, could bind his co-defendant insofar as a speedy trial is concerned." The prospect of a defendant making a spurious claim in order to prevent his co-defendant from enjoying the benefits of a speedy trial is indeed far-fetched. If the majority simply means that irrespective of intent the co-defendant who has taken no appellate steps is therefore deprived of a speedy trial, the position is unrealistic. The prospect of no trial is much more attractive than a speedy retrial to any normal criminal defendant. In any event, there is nothing at all to suggest here that Badalamente's petition for a writ of certiorari was spurious. Although the majority notes that *United States v. Crispino*, 392 F.Supp. 764 (S.D. N.Y.1975) upon which he relied was subsequently reversed in this court, it did represent the considered view of a district court judge. We cannot therefore characterize a writ based on that opinion as spurious. A defendant who is convicted has the untrammelled right to appellate review and we cannot premise a re-trial rule upon the assumption that the ground for the review is flimsy or phony. The co-defendants of Roemer were also unsuccessful in obtaining certiorari but there is no indication in that case that this court made any assessment of the odds of appellate success in formulating its re-trial rule. In this case the ninety-day period for the re-trial under Rule 6 commenced when Badalamente's petition for certiorari was denied on April 14, 1975. The *Roemer* rule thus spares the government and the defendant the burden of an unnecessary trial if appellate review ultimately exonerates the defendant; if review is not successful, the public's interest in the punishment and deterrence of criminal behavior will be accommodated by allowing re-trial within 90 days from the time review proves fruitless. It thus seems to me that this case is well within the rationale of *Roemer*, that it does not represent an expansion of that case, and that the distinctions proffered by the majority are not at all meaningful.

I fully concur with that part of the majority opinion upholding the propriety of the direction that on re-trial the case be assigned to a different district court judge.